No. 55,462

STATE OF KANSAS, *Appellee,* v. CLYDE RICHARD, a/k/a CLYDE RHODES, *Appellant.*

(681 P.2d 612)

Opinion filed April 27, 1984.

*Bruce E. Borders,* of Independence, argued the cause and was on the brief for the appellant.

*Jeffrey A. Chubb,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an appeal in a criminal action from a jury verdict finding Clyde Richard a/k/a Clyde Rhodes (defendant-appellant) guilty of aggravated battery (K.S.A. 21-3414) and first-degree murder (K.S.A. 21-3401).

In the early morning hours of June 8, 1980, Darlene Bruner was shot through the head while standing inside an open doorway at the Twenty Grand Club, a drinking and dancing establishment, in Independence, Kansas. She died immediately. The bullet which killed her passed through a paneled wall behind her and was found embedded in a concrete block behind a second wall. From the holes in the walls it was determined the shot had been fired from a point west of the open doors. The path of the bullet passed directly over a flatbed truck parked in the parking lot of the club, several feet from the doors. Although several people were standing in the parking lot and inside the club near the doors at the time, no one saw who fired the fatal shot. Richard Collins, who was dating Darlene, was standing in the parking lot about ten feet east of the doors when the shot was fired. He looked toward the flatbed truck where he thought the shot had come from. He saw someone running away from the club through an adjoining wooded lot. He could not identify the person he saw running. A man who lived on the other side of the wooded lot testified that after he heard the shot he saw a man run through the lot and get into a car parked in the street across from his house and drive off.

The victim's sister, Debbie Bruner, testified that immediately before she heard the shot fired she looked out into the parking lot as she was walking past the doors to the Club and saw the appellant standing near the flatbed truck. After the shot was fired she began screaming that the appellant had shot her sister. She went home and told this to their mother. However, she did not tell this to police until the appellant was apprehended two years later because she was afraid of what he would do to her.

The appellant was considered the prime suspect in the murder for several reasons. He and Darlene had apparently been involved in a relationship for several years. There was testimony he was the father of her four children. A cousin of the victim

testified that in December 1979 he was with Darlene and the appellant at Darlene's sister's house, when an argument ensued between Darlene and the appellant. The appellant told Darlene if he ever caught her with another man, he would "follow her to the end of the earth and kill her."

At the time of the murder the appellant was wanted on an aggravated battery charge stemming from a shooting incident two weeks earlier involving Darlene and Richard Collins. Darlene and Collins were riding around in Darlene's car when a car in which the appellant was a passenger pulled along side theirs and the appellant fired a shotgun at them. Both sustained injuries to the face and neck from shattered glass and shotgun pellets. A few hours earlier Collins had seen the appellant drive by his home while he and Darlene were there watching television. Delois Carter, the driver of the car in which the appellant was riding when the shooting occurred, was apprehended and pled guilty to aiding and abetting the aggravated battery.

Following that incident the appellant apparently fled from Independence to avoid prosecution. However, he was seen making a telephone call from a public phone booth in Independence the day of the murder by a former co-worker. Delois Carter told police she saw the appellant the night of the murder and rode around with him in his car. They drove by the victim's mother's house and the Twenty Grand Club before he took her home. She saw a pistol and either a shotgun or a rifle in the back seat of his car. She learned of Darlene Bruner's death the next day. Investigators determined the bullet which killed Bruner could have been fired from either a pistol or a rifle.

The appellant was arrested two years later in Oakland, California, living under the name of Clyde Rhodes, and was returned to Kansas for trial on the aggravated battery and murder charges. A witness who was in jail with the appellant while he was awaiting trial testified he overheard the appellant say he "shot this broad, and there wasn't a witness alive to prove it." The appellant presented an alibi witness who testified the appellant stayed at his house in Kansas City for three weeks in either May or June of 1980. Other defense witnesses testified for the purpose of impeaching the testimony of Delois Carter. The appellant was convicted of both charges.

On appeal the appellant does not challenge the sufficiency of the evidence.

The appellant first contends the trial court erred in allowing Delois Carter's attorney to testify as a rebuttal witness for the State that her plea of guilty to the aggravated battery charge was consistent with the facts as he understood them. Throughout trial the credibility of Carter was attacked by the defense in an effort to show the appellant was not the person who fired the shotgun at Collins and the victim in the earlier shooting incident. Carter testified at trial the appellant shot Darlene Bruner with a shotgun while riding around in her (Carter's) car, and that she pled guilty to aiding and abetting in that offense. The night Darlene was killed Carter rode around with the appellant and saw a shotgun and a pistol in his car. She also testified the appellant is the father of her two children. However, on cross-examination, she contradicted her prior testimony, stating she had told police things that were not true about the appellant, and she did not see him with a gun or go riding around with him on June 7, 1980. A police officer who interviewed Carter several times during the investigation testified Carter told him she went with the appellant the night of the first shooting incident to find Darlene so he could shoot her because Carter wanted the appellant to herself. He also indicated she never varied her story from the first statement she gave police. Another officer also indicated Carter made prior statements about the guns she saw in the back seat of the appellant's car the night of the murder, which was consistent with her testimony at trial.

Paul Reed, a psychologist, and Dr. Johnny Edrozo, a psychiatrist, were called as defense witnesses to testify concerning Carter's ability to tell the truth. Reed interviewed Carter in 1981 upon the request of her probation officer. He determined she had a low I.Q. and was mildly mentally retarded. He believed she had difficulty in selecting words to express what she was thinking and that stress would add to that difficulty. Dr. Edrozo interviewed Carter a week before trial at the request of the parties after the appellant obtained an order from the court requiring psychiatric evaluation of Carter. Dr. Edrozo found Carter to be slow mentally, with difficulty concentrating and making decisions. He stated Carter would become confused and unreliable when placed under pressure and that she was susceptible to suggestion because of her desire to please others.

In rebuttal the State called Robert Scovel, the attorney who represented Carter on the aggravated battery charge. He testified he talked with Carter six to ten times concerning the case, discussed her version of the facts with her, was provided information concerning the charge, and made his own investigation into the facts. He then testified:

"Q. As a result of all that, what was your advice to her concerning a plea?
"A. I felt that the facts warranted the plea as was entered in the case.
"Q. Was her plea consistent, then, with the facts as you understood them at the time?
"A. Yes, it was."

On cross-examination Mr. Scovel stated he was not present during the rest of the trial and did not know how the evidence presented compared with the information he had concerning the case when Carter entered her plea of guilty. On redirect the following exchange took place:

"Q. A reference was made to evidence at your disposal. Did that include a statement taken from Delois Carter, taken by the detective, Troy Roberson?
"A. That's correct, and I believe there was a statement from Richard Collins.
"Q. Along with other police reports?
"A. And the police—official police reports."

The jury was given the following instruction with respect to this testimony:

"You are instructed that the testimony of Robert Scovel was offered solely to support the credibility of a witness, Delois Carter, and should not be considered by you as evidence of the defendant's guilt."

The appellant challenges this rebuttal testimony, claiming it was improperly admitted because it suggested to the jury that an expert in legal matters had reviewed the facts in the case, including police reports which were not in evidence, and had determined that guilt was the proper conclusion to draw from the evidence. This had the effect of allowing the witness to pass on the weight or credibility of the evidence, which is solely within the province of the jury. The appellant states "[t]he ultimate effect of [this] testimony was to pass judgment on the case against Richard."

The rules relating to rebuttal evidence were summarized in *State v. Weigel*, 228 Kan. 194, Syl. ¶ 9, 612 P.2d 636 (1980):

"Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may tend to corroborate evidence of a party who first presented

evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract or disprove testimony or facts introduced by or on behalf of the adverse party. Such evidence includes not only testimony which contradicts the witnesses on the opposite side, but also corroborates previous testimony. The use and extent of rebuttal rests in the sound discretion of the trial court and its ruling will not be reversed unless it appears the discretion has been abused to a party's prejudice."

See also *State v. Schultz,* 225 Kan. 135, 138, 587 P.2d 901 (1978); *State v. Phipps,* 224 Kan. 158, 161, 578 P.2d 709 (1978).

Under the broad scope of this rule the testimony complained of was properly received as rebuttal evidence. The appellant attempted to discredit the testimony of Delois Carter, a key prosecution witness, by suggesting that due to her slow mental ability she had been compelled to plead guilty to a crime she was not involved in and had mistakenly implicated the appellant in those crimes upon the suggestion of others. Mr. Scovel's testimony corroborated both Carter's testimony concerning the facts underlying the charges against the appellant as well as evidence of prior consistent statements made by Carter to the police during the investigation of the murder. The testimony also served to refute the evidence introduced by the appellant to show Carter's testimony was unreliable.

The crux of the appellant's complaint is that Scovel's testimony was unduly prejudicial because he is an attorney. In *State v. Washington,* 229 Kan. 47, 60, 622 P.2d 986 (1981), we recognized the potential prejudice in allowing a *prosecuting attorney* to testify in a criminal proceeding because of the danger that a jury will attach more importance to the testimony of a lawyer in a case than to an ordinary witness. See also *State v. Ryan,* 137 Kan. 733, 737, 22 P.2d 418 (1933). In *Washington* the majority of the court held it was not an abuse of discretion for an assistant district attorney who had not participated in the prosecution to testify as a rebuttal witness that only a small percentage of rape victims she had personally observed in prosecuting rape cases and working as a rape counselor displayed visual evidence of injury. In the instant case Mr. Scovel was not involved in any way in the prosecution of the appellant. He was familiar with the case only through his representation of Delois Carter in the State's prosecution of her for aiding and abetting in the aggravated battery of Darlene Bruner and Richard Collins.

The admissibility of evidence in the form of an opinion is controlled by K.S.A. 60-456, which reads in pertinent part:

"(a) If the witness is not testifying as an expert his or her testimony in the form of opinions or inferences is limited to such opinions or inferences as the judge finds (a) may be rationally based on the perception of the witness and (b) are helpful to a clearer understanding of his or her testimony.

"(b) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skills, experience or training possessed by the witness."

Subsection (a) of this statute permits the admission of opinions by nonexperts if the judge finds they may be rationally based upon the perceptions of the witnesses and if helpful to a clear understanding of their testimony. The trial court is vested with wide discretion in this regard. *Schmeck v. City of Shawnee*, 232 Kan. 11, 31, 651 P.2d 585 (1982); *State v. Craig*, 215 Kan. 381, 383, 524 P.2d 679 (1974). When it is not shown the witness had sufficient knowledge on which to base an opinion, the opinion testimony is so conjectural it lacks probative value and may be properly excluded by the trial court. *State v. Amodei*, 222 Kan. 140, 146-47, 563 P.2d 440 (1977). Lay witness opinions are admissible even though they embrace ultimate issues. *Schmeck v. City of Shawnee*, 232 Kan. at 31; K.S.A. 60-456(d). The rules pertaining to the admissibility of expert opinion testimony under 60-456(b) are substantially the same as those pertaining to lay witness testimony. An expert witness may give an opinion on an ultimate issue only insofar as the opinion will aid the jury in the interpretation of technical facts or assist the jury in understanding the material in evidence. An expert witness may not pass on the weight or credibility of the evidence, for those matters are clearly within the province of the jury. *State v. Hobson*, 234 Kan. 133, 160, 671 P.2d 1365 (1983); *State v. Moore*, 230 Kan. 495, 497, 639 P.2d 458 (1982).

Mr. Scovel was not called as an expert witness nor was he qualified as an expert by the State in any manner. His testimony was limited to relating the types of information he had personally received and reviewed in representing Ms. Carter on the aiding and abetting charge. As Scovel indicated, this information consisted of Carter's version of the facts, police reports and his own investigation of the facts. He did not, however, indicate the

substance of this information. He then expressed his opinion that Carter's plea of guilty to the aiding and abetting charge was consistent with the information he had concerning the charge. This opinion was elicited for the sole purpose of supporting Carter's earlier testimony and prior consistent statements made to police to the effect that the appellant had fired at Bruner and Collins with a shotgun while riding in Carter's car. It also refuted the appellant's suggestion that Carter had pled guilty to the charge although she had not actually been involved in the crime. This opinion was based on Scovel's perception of the information concerning the charges against his client only and was helpful in providing the jury a clearer understanding of his testimony. The opinion did not embrace the ultimate issue of the appellant's guilt or innocence, but was limited only to the basis of Carter's plea of guilty based upon her incriminating statements made to her attorney and the police, as well as statements of other witnesses.

An instruction was given expressly limiting the use of this testimony to the consideration of Carter's credibility. The opinion testimony elicited from Mr. Scovel, whether characterized as lay or expert opinion testimony, did not pass on the weight or credibility of the evidence, but merely constituted proper rebuttal evidence for the jury to consider in weighing the credibility of Delois Carter's testimony. Under K.S.A. 60-445 it is within the broad discretion of the trial court to balance the probative value of evidence against the prejudicial effect it may have on the jury. *State v. Green,* 232 Kan. 116, 123, 652 P.2d 697 (1982). The evidence presented here was not so prejudicial as to outweigh its probative value and deprive the appellant of a fair trial. Under the facts and circumstances of this case the opinion testimony was properly admitted as rebuttal evidence.

The appellant next contends the trial court erred in denying his motion for a new trial based on newly discovered evidence. That motion was based upon the testimony of Michael Davis who had met the appellant in jail following the trial in this case. Davis worked with Richard Collins at the Twenty Grand Club. Davis testified that one evening during the trial he had a conversation with Collins about the night of the murder and Collins told Davis the person he saw running that night who supposedly committed the murder was definitely not the appellant. Collins

testified he told Davis he "wasn't sure if it was Clyde in the parking lot." He stated this was consistent with his testimony at trial that he could not identify the person he saw running. He did not tell Davis he thought it was someone other than the appellant. He further testified both men had been drinking prior to the conversation.

The rules relative to the granting of a new trial on the basis of newly discovered evidence, pursuant to K.S.A. 22-3501, were summarized in *State v. Ashworth,* 231 Kan. 623, 630, 647 P.2d 1281 (1982), as follows:

" 'The granting of a new trial for newly discovered evidence is in the trial court's discretion. (*State v. Larkin,* 212 Kan. 158, 510 P.2d 123, *cert. den.* 414 U.S. 848, 38 L.Ed.2d 95, 94 S.Ct. 134.) A new trial should not be granted on the ground of newly discovered evidence unless the evidence is of such materiality that it would be likely to produce a different result upon re-trial. (*State v. Hale,* 206 Kan. 521, 479 P.2d 902.) The credibility of the evidence offered in support of the motion is for the trial court's consideration. (*State v. Anderson,* 211 Kan. 148, 505 P.2d 691; *State v. Larkin,* [212 Kan. 158].) The burden of proof is on defendant to show the alleged newly discovered evidence could not with reasonable diligence have been produced at trial. (*State v. Lora,* 213 Kan. 184, 515 P.2d 1086; *State v. Arney,* 218 Kan. 369, 544 P.2d 334.) The appellate review of an order denying a new trial is limited to whether the trial court abused its discretion. (*State v. Campbell,* 207 Kan. 152, 483 P.2d 495; *State v. Anderson,* [211 Kan. 148].)' "

See also *State v. Myrick & Nelms,* 228 Kan. 406, 423, 616 P.2d 1066 (1980), and cases cited therein; *State v. Andrews,* 228 Kan. 368, 376-77, 614 P.2d 447 (1980).

The trial court, in denying the motion, concluded Davis' testimony was impeachment testimony and would not be likely to produce a different result upon retrial. A new trial is not granted on the basis of newly discovered evidence which merely tends to impeach or discredit the testimony of a witness. *State v. Foy,* 224 Kan. 558, 569, 582 P.2d 281 (1978). The trial testimony of Richard Collins concerning his observations the night of the murder did not serve in any way to identify the murderer. It merely corroborated the physical evidence and testimony of other witnesses as to the events which occurred that night. The trial court apparently had doubts concerning Davis' credibility and did not believe his testimony would alter the jury's consideration of the evidence. The trial court's denial of the motion for a new trial did not constitute an abuse of discretion.

The appellant contends the trial court erred in denying his

motion for a change of venue. A hearing on the motion was held prior to trial. The appellant produced various newspaper clippings and records of television and radio newscasts, indicating the appellant was the prime suspect in the slaying, which were published or aired at the time of the homicide and two years later when the appellant was apprehended. A "Crimestoppers" report aired in June 1982, by a television station in Pittsburg, whose audience included the Montgomery County area, quoted Darlene Bruner's mother as saying "I feel that he's the guy and I'm proud they got him." The appellant also offered the testimony of an attorney who practices law in Montgomery County who expressed surprise at the Crimestoppers report because it showed a potential witness (apparently referring to the victim's mother) expressing an opinion as to the guilt or innocence of the appellant. At least one report described the appellant as a "fugitive" and other reports graphically described the scene of the murder and the cause of death.

This court has repeatedly held that one moving for a change of venue has the burden of establishing prejudice, and that specific facts and circumstances must be established which indicate that it will be practically impossible to obtain an impartial jury in the original county to try the case. *State v. Crispin*, 234 Kan. 104, 107, 671 P.2d 502 (1983); *State v. Rainey*, 233 Kan. 13, 14, 660 P.2d 544 (1983). In *State v. Crump*, 232 Kan. 265, Syl. ¶ 6, 654 P.2d 922 (1982), the following rules were stated concerning a change of venue in criminal cases:

"A change in venue in a criminal case lies within the sound discretion of the trial court. The burden of proof is cast upon defendant to show prejudice in the community which will prevent him from obtaining a fair and impartial trial. Media publicity alone has never established prejudice per se. Defendant must show prejudice has reached the community to the degree it is impossible to get an impartial jury."

See also *State v. Hill*, 233 Kan. 648, 651, 664 P.2d 840 (1983); *State v. Ashworth*, 231 Kan. at 626; *State v. Schlicher*, 230 Kan. 482, 484, 639 P.2d 467 (1982); *State v. Salem*, 230 Kan. 341, 343, 634 P.2d 1109 (1981); *State v. Myrick & Nelms*, 228 Kan. 406.

Here the appellant did little more than provide copies of factual news reports for the trial court and indicate one viewer's surprise at the comments of the victim's mother contained in the report aired after the appellant's arrest. Excluding the Crimestoppers report, the reports on the whole appear to be objective

accounts of the facts. As we said in *State v. Taylor,* 234 Kan. 401, 404, 673 P.2d 1140 (1983):

"The publication of articles in a local newspaper and coverage by local radio or TV do not per se establish prejudice. Mass media coverage and the dissemination of the news is a reality. We accept the fact that informed jurors are aware of newsworthy events that occur locally, nationally and world-wide. The law does not require disqualification of an informed juror who is able to give the defendant a fair and impartial trial."

See also *State v. Myrick & Nelms,* 228 Kan. at 417.

The appellant requests this court to adopt a rule that upon a showing of overwhelming news coverage of a prejudicial nature, prejudice in the community should be assumed or the burden to show lack of prejudice should shift to the State. This we decline to do. The publicity surrounding the murder of Darlene Bruner does not appear to be unduly prejudicial or overwhelming considering the heinous nature of the crime and the length of time between the commission of the crime and trial. The record of the voir dire indicates the appellant had little difficulty in choosing the jury. Only two jurors were challenged and excused for cause relating to pretrial publicity. The appellant did not renew his motion for change of venue after the voir dire. There has been no showing that overwhelming publicity of a prejudicial nature was present in this case or that prejudice existed which would deny the appellant a fair trial. The trial court did not err in its refusal to grant a change of venue.

As his final point on appeal the appellant contends the trial court erred in imposing the maximum sentence for the aggravated battery. The appellant contends the trial court abused its discretion in not imposing the minimum sentence because no consideration was given to the factors set forth in K.S.A. 21-4606. The appellant points out that the presentence report did not indicate the maximum sentence be imposed. The appellant was sentenced to confinement for not less than five nor more than twenty years. Under K.S.A. 21-4501(*c*) the appellant could have been sentenced on the aggravated battery, a class C felony, to a minimum of not less than one nor more than five years, and a maximum of not less than ten nor more than twenty years. This sentence was ordered to run concurrently with the life sentence imposed on the first-degree murder charge, which was mandatory under 21-4501(*a*). The trial court did not state on the record that it had considered the factors enumerated in 21-4606 in

imposing sentence. The court specifically found the offenses were committed with a firearm, thereby making the provisions of the firearms statute, K.S.A. 21-4618, applicable.

This court has long adhered to the rule that a sentence imposed by a trial court will not be disturbed on the ground it is excessive, provided it is within the limits prescribed by law and within the realm of discretion on the part of the trial court, and the sentence is not the result of partiality, prejudice, oppression or corrupt motive. See *State v. Crispin*, 234 Kan. 104, Syl. ¶ 7; *State v. Coberly*, 233 Kan. 100, 110, 661 P.2d 383 (1983). In *State v. Buckner*, 223 Kan. 138, 151, 574 P.2d 918 (1977), we also stated:

"The legislature has dictated, in K.S.A. 21-4606, certain minimum factors to be considered in imposing sentence. Although the statute may not require it, we feel that when the sentence exceeds the minimum, it is better practice for the trial court to make, as part of the record, a detailed statement of the facts and factors considered by the court in imposing sentence. Such a record would be of great assistance to the appellate courts in determining whether the trial court has abused its discretion."

See also *State v. Reeves*, 232 Kan. 143, 146, 652 P.2d 713 (1982); *State v. Coberly*, 233 Kan. at 111.

Although the trial court did not expressly consider the factors set forth in 21-4606 in sentencing the appellant, we do not believe the trial court abused its discretion in imposing a sentence in excess of the minimum allowed under K.S.A. 21-4501(c) on the aggravated battery charge. The evidence indicates the appellant twice made attempts upon the life of Darlene Bruner, the second of which was successful. No mitigating factors appear in the record for fixing a minimum sentence, such as grounds for excusing or justifying the appellant's criminal conduct or conduct by the victim which induced or facilitated the defendant's criminal conduct. The two sentences were ordered to run concurrently. Where indeterminate sentences are imposed on the same date and run concurrently, the shorter minimum terms merge in and are satisfied by serving the longest minimum term. K.S.A. 1983 Supp. 21-4608(6)(a). The sentencing statute in effect at the time of this case, K.S.A. 1979 Supp. 22-3717(2)(D) (now K.S.A. 1983 Supp. 22-3717[a]), required that anyone sentenced under 21-4618 (the firearms statute) serve the entire minimum sentence imposed. Under K.S.A. 1979 Supp. 22-3717(2)(A) (now K.S.A. 1983 Supp. 22-3717[b]), an inmate sentenced for a class A

felony, *i.e.*, first-degree murder, shall be eligible for parole after serving fifteen years of confinement. Therefore, as a practical matter, the appellant's life sentence controls the time the appellant will serve in prison and the sentence imposed on the aggravated battery has no bearing on the appellant's parole eligibility. The sentence imposed was within the limits prescribed by statute. We find no error.

The judgment of the lower court is affirmed.