No. 58,564

STATE OF KANSAS, *Appellee,* v. THOMAS BIRD, *Appellant.*
(729 P.2d 1136)

Opinion filed December 5, 1986.

*Benjamin C. Wood,* chief appellate defender, argued the cause, and *Melissa Sheridan,* assistant appellate defender, was with him on the brief for appellant.

*Rodney H. Symmonds,* county attorney, argued the cause, and *Robert T. Stephan,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

PRAGER, J.: This is a direct appeal by the defendant, Thomas Bird, from a jury conviction of first-degree premeditated murder (K.S.A. 21-3401). The charge arose out of the death of the defendant's wife, Sandra Bird, whose body was found on July 17, 1983, lying face down in a river in front of her overturned car. The death occurred below the Rocky Ford Bridge which is located south of the city of Emporia on a gravel road. Directly south of the Rocky Ford Bridge there is an S-curve consisting of two 90-degree angle turns.

Sandra Bird's body was examined by Dr. Juan Gabriel, who performed an autopsy and determined that Sandra had died as the result of an automobile accident when her car missed the bridge and proceeded down an embankment into the river. The doctor noted that Sandra's most serious injury was a transected kidney which he stated was the kind of injury people receive in motor vehicle accidents. At that time, no one seemed to question Dr. Gabriel's decision. Shortly after the body was discovered, police officers arrived at the scene and took photographs and measurements. From an examination of the gravel roadway, ditches, and the fence rows south of the bridge, it was concluded

that there was no evidence that the car was out of control or made any kind of braking or sliding action before going down the embankment,

Subsequent developments caused the police authorities to believe that the death of Sandra Bird had resulted from criminal action. In October of 1984, the body of Sandra Bird was exhumed and a second autopsy was performed by Dr. William G. Eckert, a certified forensic pathologist. In addition to the injuries noted by Dr. Gabriel, the second autopsy revealed fractures of the left shoulder blade and a laceration on the top of her head indicating a considerable amount of impact or blunt trauma which, according to Dr. Eckert, was capable of rendering a person unconscious instantaneously. Dr. Eckert also found three linear type injuries above the left wrist which was fractured, a similar injury on the right arm above the wrist, and one in the elbow joint of the right arm. Dr. Eckert was of the opinion that the injuries on the back of her arms were defensive injuries. Dr. Eckert explained defensive injuries as injuries caused when a person has his arms outstretched in an effort to ward off blows in an attack. In the doctor's opinion, the linear marks above her wrist could have been caused by an instrument such as a branch of a tree, a baseball bat, a pool cue, or a tire iron. In Dr. Eckert's opinion, the injuries to Sandra Bird's kidney could have been caused by her falling from a height in excess of 20 feet. An important part of the opinion of Dr. Eckert was that he found no injuries on Sandra Bird's body which could have been caused by her ejection from an automobile. The autopsy by Dr. Eckert resulted in further investigation by the county attorney. This prosecution followed.

There were a number of factual issues presented at trial in the case, the most important of which was whether Sandra Bird's death was caused when her body was ejected from the moving automobile as the result of a tragic accident or whether she was killed as a result of a brutal attack on the bridge and the throwing of her body into the river.

The matter was presented to a grand jury which brought in an indictment charging defendant with first-degree premeditated murder. Thomas Bird was tried on the indictment to a jury in Lyon County and was found guilty as charged. A review of the transcript of the trial and the many exhibits in the case shows clearly that the case was tried by two able Kansas trial attorneys

who represented their clients in a highly professional manner. The case was difficult to try, because there were no eyewitnesses to the killing and the case had to be determined by the jury on the basis of circumstantial evidence. The prosecution presented testimony of 72 witnesses and over 100 exhibits for consideration by the jury. The State's evidence produced factual circumstances which wove a web of guilt around the defendant. As to the cause of Sandra Bird's death, the State's evidence established that there were no skid marks or other evidence at the scene indicating that the deceased's vehicle had gone out of control after going around the S-curve south of the Rocky Ford Bridge. Police officers at the scene observed blood on the bridge and on a tree located directly below the east edge of the bridge which was located 20 feet from the resting place of the car. The blood on the tree was type A, which was the same type of blood as Sandra Bird's. There was no credible explanation as to how Sandra Bird's blood could be located on the west side of the tree, if Sandra Bird's injury had resulted from being ejected from the vehicle as it traveled east of the tree from the road into the creek.

Sandra Bird's body was found lying face down in the water in front of her car. Dr. Gabriel concluded that her death was caused by loss of blood or hemorrhage due to internal injuries caused by blunt trauma. In his judgment, her death resulted approximately 30 minutes to one hour after her injuries occurred when she was ejected from her vehicle and thrown into the water. There is no satisfactory explanation as to why there was no water found in Sandra Bird's lungs as she lay under water. The relative positions of Sandra Bird's body and her automobile in their final resting places do not support the defense theory that Sandra Bird had been ejected from the moving vehicle when its left-hand door was torn off. A State's expert witness testified that, given the mechanics of the automobile's roll, it was his opinion that Sandra Bird's body would have been deposited on the land between the door and the final resting place of the vehicle and that her body would not have ended up in front of the vehicle in the river. The interior of Sandra's car contained no blood or hair which would have indicated a person had been banged around inside the car. Simply stated, the physical evidence at the scene and the more complete examination of Sandra Bird's body performed at the second autopsy furnished substantial evidence that Sandra Bird

had not been killed as the result of an automobile accident, but rather that her fatal injuries were suffered as a result of blows struck on the bridge, following which her body was thrown over the rail into the river.

There was other evidence which indicated that Sandra Bird had been standing on the bridge in the area where blood was found. There was evidence that at 9:30 p.m. on the evening of July 17, Sandra had stopped by their home, talked with the babysitter, and picked up a bottle of wine and a bottle of bourbon. A wristwatch identified as belonging to Sandra Bird was found under the bridge in the vicinity of the tree where blood of her type was discovered. The planks on the bridge above the body had a one-to-three-inch gap between the planks. Two red plastic cups found in the entrance to a field just to the south of the bridge were similar to ones found underneath the bridge.

The State's evidence established a motive for defendant to kill his wife. Thomas and Sandra Bird were having marital difficulties as the result of an affair which defendant was having with Lorna Anderson. Sandra Bird had visited with some of the State's witnesses about her marital problems and had indicated that they were caused by defendant's relationship with Lorna Anderson.

Darrell Carter, an acquaintance of Lorna Anderson, testified that in May of 1983, two months before Sandra's death, he had a conversation with Thomas Bird and Lorna Anderson at the First Lutheran Church. According to Darrell Carter, he and Lorna and the defendant discussed plans to kill Lorna Anderson's husband, Martin Anderson. Two plans to kill Martin Anderson were outlined to Darrell Carter at the church. He testified that one death plan was proposed by Thomas Bird. The defendant stated he had been out in the country south on a gravel road. There was a bridge on the river and it was about 50 feet down to the river. Tom Bird suggested that, if a person was drugged or drunk, that person could easily miss the curve in the road. His plan was to drug Martin Anderson at home, take him down to the river, shove his car into the river, and make it look like an accident. Lorna Anderson and Tom Bird wanted Darrell Carter to come down to the river and pick up Tom Bird and bring him back to town. They wanted Lorna to be at home so it would not arouse suspicion, and

she wanted to be at home so that people could see that she was at home. At one point during the conversation, Tom Bird told Carter that he was a man of God and that he was going to kill Martin Anderson. The second plan outlined to Darrell Carter involved staging a false robbery and shooting Martin Anderson to death in Topeka.

Another State's witness, Charles Henderson, a former inmate of Lansing State Penitentiary, testified that he had been in a cell right next to that of the defendant. According to Henderson, defendant visited with him about the death of his wife and indicated that he and Lorna Anderson conspired to have his wife killed. Also, defendant discussed with Henderson the amount of money that he and Lorna Anderson were going to receive from the insurance companies. On redirect examination, Henderson testified that Tom Bird had told him that he had his wife killed. This admission was never countered by any evidence presented by the defendant.

On the next day following the discovery of Sandra Bird's body, the defendant discussed Sandra's death with a number of witnesses. His different versions of his activities the evening of Sandra's death were inconsistent. The defendant gave a statement to one witness which, in substance, was as follows: Early in the evening Sandra brought hamburgers to the church, and there they ate dinner. Sandra changed clothes at the church and then they went to a movie. After the movie they went by the house and Sandra picked up a bottle of wine and a bottle of bourbon at approximately 9:30 p.m. They went to the church and fixed a drink and, thereafter, they went to a private club where they each had two more drinks. They left the club at 10:45 and went back to the church where Sandra dropped off defendant. Sandra went to her office at Emporia State University to work. Between 11:15 and 11:45 defendant went jogging for approximately 2.6 miles. Sandra had said she would be gone 45 minutes to one hour but failed to return. When Sandra did not return by midnight, defendant drove by the university, but Sandra was not there. Thereafter, the defendant made telephone calls to the babysitter, personnel at the university, the Emporia police department, the sheriff's office, and the Newman hospital.

If we accept as true the defendant's statements as to his actions on the evening of Sandra's death, the defendant and Sandra had

last eaten food about 7:00 p.m. at the church. Dr. Gabriel in the first autopsy found food in Sandra Bird's stomach which caused him to form an opinion that Sandra Bird had died within three hours of her last meal. That would put the time of death in the neighborhood of 10:00 p.m., when defendant and Sandra were together.

The testimony presented by the defense tended to refute some of the theories presented by the State's witnesses. The defendant's medical expert, Dr. Bridgens, concluded that Sandra Bird had been injured when she was thrown out of the driver's side of the car as it went down the embankment at a speed of 15-20 miles per hour and rolled over. He concluded that the State's theory of how Sandra Bird died was unlikely based upon her injuries. Various other witnesses called by the defendant tended to support defendant's theory that the death was the result of an accident rather than an intentional killing. The case was submitted to the jury which believed the testimony of the State's witnesses and found the defendant guilty of first-degree murder as charged. The defendant appealed.

The defendant has raised nine points on the appeal. Defendant's first point is that the indictment was fatally defective, because it is devoid of factual allegations sufficient to inform the defendant of the nature of the accusations against him in violation of the Sixth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. Prior to the trial, the defense had moved to dismiss the indictment for the same reason, which motion was denied. The State contends the indictment was sufficient because it was couched in the terms of the statute and contained all of the essential elements of first-degree murder. In this case the indictment provided as follows:

"INDICTMENT

"The Grand Jury charges that:

COUNT I

"that on or about the 16th day of July, 1983 in Lyon County, Kansas, one THOMAS P. BIRD, then and there being, did then and there unlawfully, willfully, maliciously, deliberately, and with premeditation, kill a certain human being, to-wit: Sandra S. Bird, contrary to the form of K.S.A. 21-3401, and against the peace and dignity of the State of Kansas. (Class A Felony)

"This is a true bill.

/s/ Louella Linn

"PRESIDING JUROR"

In *State v. Bird*, 238 Kan. 160, 708 P.2d 946 (1985), a case in

which the defendant, Thomas Bird, was convicted of criminal solicitation involving a plan to murder Martin Anderson under K.S.A. 1984 Supp. 21-3303, this court discussed the principles to be applied in determining the sufficiency of the charges contained in an indictment or information. The court stated:

"In a felony action, the indictment or information is the jurisdictional instrument upon which the accused stands trial. *State v. Howell & Taylor*, 226 Kan. 511, 601 P.2d 1141 (1979). A conviction based upon an information which does not sufficiently charge the offense for which the accused is convicted is void. Failure of an information to sufficiently state an offense is a fundamental defect which can be raised at any time, even on appeal. See K.S.A. 22-3208(3); *State v. Robinson, Lloyd & Clark*, 229 Kan. 301, 624 P.2d 964 (1981); *State v. Minor*, 197 Kan. 296, 416 P.2d 724 (1966). Sufficiency of the indictment or information is to be measured by whether it contains the elements of the offense intended to be charged and sufficiently apprises the defendant of what he must be prepared to meet, and by whether it is specific enough to make a plea of double jeopardy possible. *Russell v. United States*, 369 U.S. 749, 763-64, 8 L. Ed. 2d 240, 82 S. Ct. 1038 (1962). Although the accused has the right to know the nature of the charges against him, the information need not set forth all the specific evidentiary facts relied on to sustain the charge. However, if the allegations in an information fail to constitute an offense in the language or meaning of an applicable statute, the information is fatally defective. *State v. Robinson, Lloyd & Clark*, 229 Kan. 301; *State v. Doyen*, 224 Kan. 482, 580 P.2d 1351 (1978).

"In this state, the sufficiency of the information is governed by the guidelines of K.S.A. 1984 Supp. 22-3201(2), which provides:

" 'The complaint, information or indictment shall be a plain and concise written statement of the essential facts constituting the crime charged, which complaint, information, or indictment, drawn in the language of the statute, shall be deemed sufficient.'

"This court has repeatedly held that an information which charges an offense in the language of the statute is sufficient. *State v. Garner*, 237 Kan. 227, 237, 699 P.2d 468 (1985); *State v. Lucas*, 221 Kan. 88, 89, 551 P.2d 1296 (1976); *State v. Barry*, 216 Kan. 609, 619, 533 P.2d 1308 (1974)." pp. 166-67.

When we examine the indictment in this case, we have no hesitancy in holding that the indictment was sufficient to satisfy the requirements of the statutes and the United States and Kansas Constitutions. K.S.A. 21-3401 defines murder in the first degree and provides:

"**21-3401 Murder in the first degree.** Murder in the first degree is the killing of a human being committed maliciously, willfully, deliberately and with premeditation or committed in the perpetration or attempt to perpetrate any felony."

Here the indictment contained all the necessary elements required in K.S.A. 21-3401 and identified the victim of the crime. The issue of probable cause had previously been determined by

the grand jury, and there is no contention that the evidence presented to the grand jury was not sufficient to support the charges in the indictment. The defendant at the time of the arraignment on the grand jury indictment requested a verbatim transcript of the grand jury proceedings and a copy of all exhibits considered by the grand jury. The district court sustained defendant's motion and a transcript and copies of the exhibits were provided. In addition, the trial court sustained the defendant's motion for a bill of particulars and ordered the State to specify the alleged criminal acts. When the attorney for the defendant received a copy of the bill of particulars, he did not ask for additional statements of fact. The defendant has failed to establish that he was surprised during the proceedings or that he was prevented from preparing his defense. The conflicting theories as to how Sandra Bird's death occurred were evident to the defendant from the beginning. We hold that the indictment was not defective for the reasons claimed by the defendant and further that defendant's right to a fair trial has not been violated because of any defects in the indictment.

The defendant raises two points claiming error in the evidentiary rulings of the trial court. The defendant maintains that the trial court erred in failing to strike the testimony of Bill Persinger, the State's expert in accident reconstruction, and in overruling the objections made to his testimony on the basis that his testimony was without factual foundation. The defendant further maintains that the trial court erred in admitting into evidence misleading diagrams of the death scene. Specifically defendant refers to the admission of State's exhibits Nos. 2 and 118. We have considered the arguments of counsel and the record and have concluded that the trial court did not commit error. The court required that Persinger's opinion be based upon the photographs and other exhibits which had already been admitted into evidence. The jury was instructed that Persinger's testimony should be considered only on the basis of exhibits which had already been admitted into evidence. Although the two diagrams complained of had not been drawn to scale, the trial court permitted the diagrams to be used to clarify the testimony of certain witnesses, but did so only after instructing the jury that exhibits Nos. 2 and 118 were not drawn to scale and that the jury should not consider them to be exhibits drawn to

scale. We find no error in the rulings of the trial court in regard to the admission of this evidence.

The defendant claims misconduct of the prosecutor because of certain language contained in the prosecutor's closing arguments. The prosecutor's comments concerned the testimony of Jan Mead, who testified that Lorna Anderson had stated that she wished something would happen to her husband and Tom's wife so that she and Tom could spend the rest of their lives together. In his closing arguments, the prosecutor referred to the testimony of Jan Mead about the statements made by Lorna Anderson that she and Tom Bird were in love, that they wanted to spend their lives together, and that they (rather than she) wished something tragic would happen to Sandra Bird and Martin Anderson. We note that no objection was made to the prosecutor's argument at the time of trial. We cannot say that the remarks of the prosecutor were so prejudicial to the case of the defendant as to constitute reversible error.

The defendant also challenges other statements made by the prosecutor which defendant claims were not supported by the evidence. We likewise find no prejudicial error. Generally it can be stated that the statements made by the prosecutor during his closing arguments were fair arguments based upon the evidence presented trial.

A fifth point raised by the defendant on appeal is that the trial court erred in denying defendant's motion for a new trial based upon newly discovered evidence. Charles Henderson testified for the State at the trial that he was next to the defendant in a cell at the state penitentiary. He testified that, while at the penitentiary in 1985, the defendant told him that he had conspired with Lorna Anderson to have his wife killed, and that he had been having an affair with Lorna Anderson for two or three years, and further that defendant would collect $300,000 on Sandra Bird's life.

On the motion for a new trial, Ms. Spires testified that she was a desk clerk at the Copa Villa Motel and spoke with Henderson the morning he was to testify. She testified Henderson told her he didn't know who Thomas Bird was and had no idea why he was there. After Henderson testified, he spoke with Ms. Spires again and told her he learned why he was there. He told her some friends in Oklahoma had left him holding the bag. He was

there to tell what had been overheard; that his friends told him some things. The trial judge denied the motion for a new trial stating that in his opinion it was unlikely there would be a different result if a new trial were granted based upon this newly discovered evidence.

The rules regarding motions for new trial based upon newly discovered evidence were recently stated in *State v. Hobson*, 237 Kan. 64, 697 P.2d 1274 (1985), which quoted *State v. Johnson*, 222 Kan. 465, 565 P.2d 993 (1977), as follows:

" 'The granting of a new trial for newly discovered evidence is in the trial court's discretion. (*State v. Larkin*, 212 Kan. 158, 510 P.2d 123, *cert. den.* 414 U.S. 848, 38 L. Ed. 2d 95, 94 S. Ct. 134.) A new trial should not be granted on the ground of newly discovered evidence unless the evidence is of such materiality that it would be likely to produce a different result upon re-trial. (*State v. Hale*, 206 Kan. 521, 479 P.2d 902.) The credibility of the evidence offered in support of the motion is for the trial court's consideration. (*State v. Anderson*, 211 Kan. 148, 505 P.2d 691; *State v. Larkin*, [212 Kan. 158].) The burden of proof is on defendant to show the alleged newly discovered evidence could not with reasonable diligence have been produced at trial. (*State v. Lora*, 213 Kan. 184, 515 P.2d 1086; *State v. Arney*, 218 Kan. 369, 544 P.2d 334.) The appellate review of an order denying a new trial is limited to whether the trial court abused its discretion. (*State v. Campbell*, 207 Kan. 152, 483 P.2d 495; *State v. Anderson*, [211 Kan. 148].)' " 237 Kan. at 66.

The *Hobson* court went on to state:

"These rules have been repeated by the court many times, most recently in *State v. Richard*, 235 Kan. 355, 363, 681 P.2d 612 (1984). In *Richard* we also stated '[a] new trial is not granted on the basis of newly discovered evidence which merely tends to impeach or discredit the testimony of a witness.' 235 Kan. at 363." 237 Kan. at 66.

We have considered the record in the case and have concluded that the district court did not abuse its discretion in denying defendant's motion for a new trial based on the testimony of Ms. Spires. The testimony of Spires tended to imply that Henderson was told of the conspiracy through friends rather than defendant, but she admitted that she did not understand whether he was told by defendant or his friends about the conspiracy. Assuming that Ms. Spires actually recalled what Charles Henderson said, the testimony would have been, at best, only in the nature of impeachment testimony. Ordinarily a new trial is not granted on newly discovered evidence which merely tends to impeach or discredit the testimony of a witness. *State v. Richard*, 235 Kan. 355, 363, 681 P.2d 612 (1984). We find this point to be without merit.

The defendant next maintains that reversal is required because the evidence presented by the State varied radically from the offense charged in the indictment and contained in the bill of particulars. He complains that the indictment and bill of particulars alleges that the defendant killed Sandra Bird by applying force causing her to sustain and suffer blunt injuries. The court admitted the testimony of Charles Henderson that defendant stated he conspired to have his wife killed. Vernon Humphrey's police report also alluded to this conversation. We note that the defendant did not object at the time of Henderson's testimony. However, after both sides had rested, the defendant moved to strike the testimony or in the alternative for a mistrial. It is clear in this case that defense counsel had a copy of Officer Humphrey's report prior to the trial which alluded to the information. No motion in limine was filed to exclude Henderson's testimony. The evidence of Henderson was offered to show the defendant's intent and the fact that he had been involved in the death of his wife.

The defendant contends that the State speculated that Thomas Bird threw Sandra Bird off the Rocky Ford Bridge. That was a matter for the consideration of the jury and the State's evidence in the case indicated that it had occurred. It was up to the jury to determine that point. We find no merit on this issue.

The seventh point raised by the defendant is that the State's evidence was insufficient to permit a rational factfinder to conclude beyond a reasonable doubt that Sandra Bird's death resulted from a homicide rather than an accident, and, furthermore, that there was no substantial competent evidence to place Thomas Bird at the scene of the wreck, regardless of whether Sandra Bird's death is characterized as accidental or homicidal. The test for determining the sufficiency of the State's evidence to support a conviction has been stated many times by this court. In a criminal action, when the defendant challenges the sufficiency of the evidence to support a conviction, the standard of review on appeal is whether the evidence, viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The appellate court looks only to the evidence in favor of the verdict to determine if the essential

elements of the charge are sustained. *State v. Pink*, 236 Kan. 715, 729, 696 P.2d 358 (1985).

Likewise, a verdict of guilty in a criminal case will not be disturbed on appeal if there is substantial evidence from which a jury could find guilt beyond a reasonable doubt, even though the evidence is entirely circmstantial.

In *State v. Yarrington*, 238 Kan. 141, Syl. ¶¶ 5, 6, 7, 708 P.2d 524 (1985), the victim's death originally appeared to be a suicide. However, in upholding the murder conviction, the court stated:

"In a first-degree murder prosecution, premeditation may be established by circumstantial evidence, and may be inferred from the established circumstances of the case provided the inference is reasonable."

"The term corpus delicti means the body of the offense—the substance of the crime. As applied in homicide cases it has at least two component elements: (1) the fact of death, and (2) the criminal agency of another person as the cause thereof."

"The corpus delicti of a crime may be proved in whole or in part by direct testimony or by indirect testimony and circumstantial evidence."

The evidence presented in this case by the prosecution has been set forth in some detail earlier in the opinion. On the basis of the evidence contained in the record, we hold that the evidence was sufficient to sustain the jury verdict of guilty of first-degree premeditated murder.

The defendant next maintains that the trial court erred in denying defendant's pretrial motion for a change of venue. In support of defendant's motion for change of venue, Dr. John Shoemaker, President of Capital Research Services, Inc., testified he conducted a survey to find out to what extent people were aware of this case and what they thought about the case.

The survey consisted of having a staff of interviewers randomly call 306 people in Emporia who had a telephone. The survey indicated 97.4 percent of the people had heard of the case and roughly half of those surveyed believed the defendant killed his wife. The people surveyed were given three options: "Yes, he was involved in it; no, he was not; or not sure." Dr. Shoemaker's survey indicated about half of the people thought he was involved in it.

Dr. Shoemaker assumed there would be a fairly high percentage of urban people called because they only called people who had an Emporia telephone exchange. More than half of the people called thought the defendant was not guilty or were

unsure of the defendant's guilt, based on Dr. Shoemaker's survey. After consideration of the margin of error, the percentage of people who thought the defendant was not guilty or were unsure of his guilt could be as high as 55 percent. Dr. Shoemaker didn't know if a survey in other counties of the State would indicate numbers just as high or low.

In the present case, the trial court made the following findings and denied defendant's motion for a change of venue:

1. That the evidence established there has been extensive media coverage in the local area.

2. That media coverage does not per se establish prejudice.

3. That the general tone of the stories are factual representations of newsworthy occurrences reported mostly from court records.

4. The defendant has failed to demonstrate anything other than objective and factual reporting by the press.

5. That the results of the survey were inconclusive and did not establish prejudice which would deny defendant a fair and impartial trial in the county.

6. That the news stories covering defendant's previous trial contained balanced reporting of both prosecution and defense.

7. That the defendant encouraged and participated in some pretrial publicity.

8. That a change of venue at this time would be based on speculation and conjecture.

Generally this court has stated:

"A change in venue in a criminal case lies within the sound discretion of the trial court. The burden of proof is cast upon defendant to show prejudice in the community which will prevent him from obtaining a fair and impartial trial. Media publicity alone has never established prejudice per se. Defendant must show prejudice has reached the community to the degree it is impossible to get an impartial jury." *State v. Crump*, 232 Kan. 265, Syl. ¶ 6, 654 P.2d 922 (1982).

Defendant has shown no abuse of discretion by the trial court in denying the defendant's request for a change of venue.

The final issue raised on the appeal is whether the trial court erred in instructing the jury on the presumption of intent. The trial court instructed the jury in the language of PIK Crim. 2d 54.01 as revised in 1979. Defendant objected to the giving of the instruction, arguing that it relieved the State of the burden of persuasion beyond a reasonable doubt. We have considered all of the instructions together and concluded that the court's in-

struction on presumption of intent was properly given. This PIK instruction was approved in *State v. Robinson, Lloyd & Clark*, 229 Kan. 301, 306, 624 P.2d 964 (1981). The issue has recently been throughly discussed in *State v. Mason*, 238 Kan. 129, 708 P.2d 963 (1985), and in *State v. Ransom*, 239 Kan. 594, 605, 722 P.2d 540 (1986). We hold that the trial court did not err in giving this instruction.

The judgment of the district court is affirmed.