No. 62,042

STATE OF KANSAS, *Appellant,* v. MICHAEL EDWARD NEAL, *Appellee.*

(763 P.2d 621)

Opinion filed October 28, 1988.

*Ann L. Smith,* assistant county attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Sally Davis Pokorny,* county attorney, were with her on the brief for appellant.

*Joe L. Levy,* of Coffeyville, and *Patrick A. Williams,* of Tulsa, Oklahoma, argued the cause and were on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: This is an appeal by the State, pursuant to K.S.A. 1987 Supp. 22-3602(b)(4), from the trial court's order granting a new trial to defendant Michael Neal following his convictions of felony theft, K.S.A. 1987 Supp. 21-3701, and aggravated robbery, K.S.A. 21-3427. The trial court ordered a new trial on the basis of newly discovered evidence, pursuant to K.S.A. 22-3501(1). The sole issue on appeal is whether the court abused its discretion in granting the new trial. We affirm.

The events leading to Neal's conviction are as follows. A woman in Montgomery County was robbed at gunpoint at 8:20 p.m. on August 10, 1986. The victim described the robber as a masked white male, 5' 9", 145 pounds, wearing blue jeans and driving a blue car with an Oklahoma license tag. She thought there might have been another person in the car.

Shortly after the crime was reported, a police officer observed a blue car being abandoned by a man and woman who ran into a wooded area and disappeared. The officer was too far away to identify the couple. The car had been reported as stolen that morning by Darrell Simpson of Tulsa. Another officer reported seeing a man standing by an occupied blue car in the area shortly

before the robbery. He put together a composite drawing of the man he had seen. It was shown to Simpson, who said it looked like Neal, "except the hair was wrong." He explained Neal was a man who had shared a house with him several years ago, whom he had not seen since. Neal is a white male, 5' 11", weighing 170 pounds.

The Montgomery County sheriff's office contacted the Tulsa, Oklahoma, sheriff's office and discovered Neal was on house arrest for possession of a stolen credit card. A photo lineup was made. Three officers who had seen a man and woman walking away from the area of the abandoned car identified Neal. Neal objected to the lineup because his picture was larger than the other five.

A complaint was filed against Neal for aggravated robbery and felony theft of a car, and a warrant was sent to Tulsa. A Montgomery County officer then went to the Tulsa sheriff's office; there he ascertained Neal was still under the supervision of the Oklahoma Department of Corrections. While there, the officer failed to ascertain Neal's address or whether the warrant had been served. Although Neal at no time violated the terms of his house arrest, Tulsa authorities failed to serve the Kansas warrant on him. After several months, they returned the Kansas warrant marked "unknown address." The National Crime Information Center (NCIC) was notified of the outstanding warrant by Montgomery County. Through NCIC Neal was discovered a year later in Arlington, Texas, where he had moved at the end of his probation. He was extradited to Kansas for a preliminary hearing on September 10, 1987. After being bound over, his trial was set for November 3, 1987.

Neal told his attorney he had worked at Bennigan's Restaurant in Tulsa from about 5:30 to 9:30 p.m. on August 10. If true, this would have made it impossible for him to commit a robbery 80 miles away in Kansas at 8:20 p.m.. Neal's father corroborated his statement, recalling he had driven Neal to work and picked him up at the times stated by Neal. Tim Hawbacker, manager of Bennigan's in Tulsa in 1986, remembered Neal working for him, but could not remember if he had worked during the night in question. He knew if he could find the computer records of that night he would have the proof. Each employee at Bennigan's is required to clock in and out, punching in both employee and

craft codes into computer records. A complete printout of all activity in the restaurant—payroll, sales, product sold—is sent over the computer to the home office in Dallas, Texas, every night. The Tulsa restaurant stored their computer sheets over a month old in an outside storage facility. At the request of Neal's father, Hawbacker spent more than four hours digging through papers in a warehouse, trying to find the appropriate records. He was unsuccessful. Finally convinced that the year-old documents had been destroyed, he suggested that Neal's father call Bennigan's home office in Dallas to see if it could help.

On September 9, 1987, Neal wrote a letter to the Dallas office requesting a printout of his August 10, 1986, work record. When no response was received, Neal's attorney repeated the request by a letter dated September 22. Neal's father called the records department at the home office, but was told no such record was available. Before the trial, Neal's attorney was advised by Bennigan's Dallas office that Neal had indeed worked a total of 4.35 hours on August 10, 1986, but its records did not disclose the time of day the work was performed.

This was the information presented at trial. Neal was convicted by a jury on both counts. After the trial, Neal asked his father to make one more effort to obtain the needed employment information by calling Donald Leeper, the general manager for Bennigan's in Dallas. Neal knew Leeper because Leeper supervised the opening of a new Bennigan's in Arlington, Texas, where Neal worked after moving from Oklahoma. Leeper had not been contacted before because he had not supervised Neal at the Tulsa restaurant.

It fortuitously turned out that Leeper was one of the few people in the Bennigan's organization who had a thorough understanding of its computer system linking all the restaurants with the mainframe computer in Dallas. Unlike the people in Dallas who had handled Neal's earlier requests, Leeper knew the information Neal requested was still retrievable and knew how to obtain it. Leeper flew to Montgomery County for the hearing on the motion for a new trial at Bennigan's expense. He testified the Bennigan's people contacted before trial did not know that information on the time of day Neal worked was available. He testified the restaurant managers have no knowledge of what happens to the daily information they send to the

home office. The only detailed record they ever see is that which is kept for a month, and which Neal's manager, Hawbacker, had tried to find. The records retrieved from the mainframe computer show Neal's testimony at trial was correct. Neal had clocked in at 5:22 p.m. on the night of August 10, 1986, and clocked out at 9:43 p.m.

There was a distinct feature to the recorded times which became significant. Neal testified he clocked in at 5:22, clocked out at 5:27, and then immediately clocked in again at 5:27, before finally clocking out at 9:43. This odd pattern unlocked the memory of Neal's Tulsa manager, Tim Hawbacker, who then clearly recalled Neal working the night of August 10. Neal had been clocking in as a trainee, making $3.35 an hour. On the evening of August 10, he clocked in as a trainee but Hawbacker told Neal his training period was over and showed him how to clock out on the trainee code and clock back in on the service assistant code. Under this code he would make only $2.01 an hour, but would receive a share of the tips customers left.

Hawbacker testified that, if he had been contacted shortly after the crime occurred, instead of a year later, he probably would have remembered Neal working the night of August 10 without the aid of the computer printouts. At any rate, the printouts would still have been readily available to him for a month or two after the crime. He also flew to Neal's hearing at Bennigan's expense and testified he now has a clear memory of Neal working at all times between 5:27 and 9:43 p.m. He testified he saw Neal every five or ten minutes throughout the evening.

Kari Ryan, Neal's former trainer, had not worked that night, but testified by affidavit, "[I]t is impossible for anyone to clock another employee in or out on the computer, . . . ordinarily the manager watches the working times of employees like a hawk." Leeper testified managers make up prearranged schedules showing which employees are to work each shift, and have cards they check to make sure everyone is present as scheduled.

A co-employee of Neal's from Bennigan's could not remember if Neal worked that evening, but testified by affidavit it would be "highly unlikely" anyone else could get away with clocking in and out for him. Another employee testified it would be "almost impossible" for anyone to sign in or out for Neal, and said she had never heard of such a thing happening at Bennigan's. The

present manager of the Tulsa Bennigan's testified there was so much interaction between employees and management during a shift it was not likely another employee could punch in for another employee and cover for that employee. He testified such an occurrence had never come to his attention during his years with Bennigan's and that he believed an employee's absence would be noticed by the manager immediately.

An examinination of Bennigan's method of distributing tips adds credence to testimony that Neal could not have gotten away with having someone clock in and out for him on the night of August 10. Each employee receives a percentage of the total tips received each day, according to the number of hours worked. This is why employees support management's policy of sending non-essential employees home when business is slow. Thus, Hawbacker testified he probably sent Neal home at 9:43 because the waitresses at that point preferred to bus their own tables in return for a bigger percentage of tips. At the end of the day each employee's share of tips is put in a separate envelope, and the amount each employee is to receive is put in a large ledger. The next day, each employee entitled to tips signs the open ledger and receives his or her money. The ledger is subject to careful scrutiny by employees to make sure no one receives tips he or she did not earn.

Neal was shown by the computer, and thus on the ledger, to be entitled to $19.48 in tips for the evening of August 10. Leeper testified there were nine other employees entitled to tips who would have "raised some Cain" if they had seen a person listed on the ledger who had not worked the night before. He testified, "I could bring about 100 hostesses from the Bennigan's system that said they would just scream bloody murder, I mean it's just not possible."

The trial court granted Neal's motion for a new trial on the grounds of the newly discovered records, which showed the exact hours Neal worked and refreshed his manager's memory.

K.S.A. 22-3501(1) allows a trial court to grant a new trial if required in the interest of justice. One basis for a new trial is newly discovered evidence. The law regarding newly discovered evidence is clear. First, the evidence must be of such materiality it would likely produce a different result at a new trial. *State v. Armstrong,* 240 Kan. 446, 450-51, 731 P.2d 249,

*cert. denied* 96 L. Ed. 2d 702 (1987). Second, the defendant bears the burden of showing the evidence could not with reasonable diligence have been produced at trial. *State v. Arney,* 218 Kan. 369, 373, 544 P.2d 334 (1975). The scope of appellate review of an order for a new trial is limited to whether "the trial court's action was wholly unwarranted and clearly amounted to an abuse of discretion." *Hornback v Missouri-Kansas-Texas Rld. Co.,* 193 Kan. 395, 397, 395 P.2d 379 (1964).

The State first argues the trial court abused its discretion in granting a new trial because it did not make a specific finding that the two prongs regarding newly discovered evidence had been satisfied.

In *Hornback v. Missouri-Kansas-Texas Rld. Co.,* 193 Kan. 395, the trial court granted a new trial without specifying its reasons for doing so. The presumption that the trial court exercised its independent judgment on the facts prevented us from finding an abuse of discretion on this ground alone. Instead, we held the granting of a motion for a new trial rests so much in the trial court's discretion that the complaining party must show clearly established error with respect to a question of law.

The State attempts to establish such error by arguing the evidence is not of such materiality as to warrant a new trial because it is merely cumulative. It argues the jury heard evidence that Neal worked 4.35 hours on August 10, but refused to believe Neal and his father's testimony that these hours were worked during the time of the robbery. This argument is without merit.

The State's only other argument, a more serious one, is that Neal has failed to carry his burden of showing the evidence could not have been discovered before trial by reasonable diligence. Neal's attorney did not attempt to subpoena detailed records of Neal's employment. Such a subpoena would have likely resulted in the needed records being found by knowledgeable employees in the Bennigan's organization and made available before trial. Neal's counsel protests that he did not know, and should not reasonably have been expected to know, that detailed printouts were available.

The record shows Neal's attorney was reasonably diligent in his efforts to obtain the needed documented information. It must be remembered that the State's delay in serving the warrant was

partially the cause of the problem. People's memories grow stale in a year with regard to times and events. We find the evidence material and the accused diligent in his search for the needed evidence. The trial court did not abuse its discretion in granting a new trial. In light of the evidence here, it would have been an abuse of discretion to deny the motion for a new trial.

The judgment is affirmed.