No. 64,388
No. 65,654

JAMES EUGENE TAYLOR, *Appellant,* v. STATE OF KANSAS, *Appellee.*

(834 P.2d 1325)

Opinion filed July 10, 1992.

*Linda L. Eckelman,* of Dodge City, argued the cause, and *J. Patrick Lawless,* assistant appellate defender, and *Jessica R. Kunen,* chief appellate defender, were with her on the briefs for appellant.

*Julie McKenna,* county attorney, argued the cause, and *Ellen Mitchell,* assistant county attorney, and *Robert T. Stephan,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: James Eugene Taylor's conviction for first-degree murder of his wife was upheld by this court in *State v. Taylor,* 234 Kan. 401, 673 P.2d 1140 (1983). On August 15, 1988, Taylor filed a K.S.A. 60-1507 motion requesting a new trial in the district court, which was denied. Taylor appealed the denial of the 60-1507 motion to the Court of Appeals. At Taylor's request the Court of Appeals remanded the matter to the trial court for consideration of newly discovered evidence which Taylor contended should afford him a new trial. The trial court denied his second 60-1507 motion for new trial. The Court of Appeals affirmed, and Taylor's petition for review was granted by this court. On appeal, Taylor claims: (1) His due process rights were violated by the State's unlawful release of the victim's car; (2) the court improperly refused to allow the defendant to proceed pro se at the first 60-1507 hearing; (3) he was denied effective assistance of counsel at trial and on direct appeal; (4) the trial court erred in determining the entomology evidence was not newly discovered; (5) the trial court erred in failing to grant a new trial because

of newly discovered pathology evidence; and (6) the State improperly withheld exculpatory evidence.

The underlying facts are set out in *State v. Taylor*, 234 Kan. 401, and briefly repeated here. James E. Taylor, the defendant in the original proceeding, testified that on Friday, May 28, 1982, he and his wife, Shirley Ann Taylor, drove in the defendant's automobile from Salina to the Brookville Hotel, Brookville, Kansas, for dinner. The Taylors entered the Brookville Hotel at approximately 7:30 p.m., ate dinner, and departed around 8:30 p.m. The Taylors returned to the location in Salina where Mrs. Taylor had parked her car prior to dinner. After departing the defendant's automobile, Mrs. Taylor planned to shop, prior to meeting someone, and then go camping over the weekend. Defendant returned to the Salina residence. The defendant left the residence later, drove around town, purchased some gasoline at a convenience store, and then returned to the residence, where he worked on his automobile. Taylor was seen by a friend and the clerk at the convenience store during this period of time. At approximately midnight the defendant drove to Topeka, where he was to work the next day.

Taylor was unable to contact his wife in Salina by phone from Topeka. During the weekend the defendant phoned family and friends in search of his wife. On Saturday, May 29, 1982, the defendant returned to Salina, where he attempted to locate his wife. On May 31, 1982, the defendant phoned the Salina Police Department to report his wife had been missing for several days. Defendant stated he and his wife had dined at the Brookville Hotel Friday evening. He had last seen her when he dropped her off at her car in Salina at approximately 9:00 p.m.

The next day the defendant phoned the Salina Police Department to see if any progress had been made in locating his missing wife. Detective Galen Marble talked to the defendant at this time. That evening, while en route to the defendant's residence to obtain more information, Detective Marble discovered Shirley Taylor's automobile parked on a Salina street. Marble contacted the defendant at his home, obtaining additional information to complete the missing person report. Marble then told the defendant he had located Mrs. Taylor's car in Salina. In separate cars, Marble and the defendant drove to the location where Mrs.

Taylor's automobile had been found. The defendant told Marble that the car had originally been parked in a different location when he last saw his wife Friday night.

On June 2, 1982, the defendant was requested to come to the police station. In three separate sessions from 12:10 p.m. to 5:45 p.m., the defendant was questioned about his wife's disappearance. During the last session, the defendant was informed of his *Miranda* rights prior to questioning. Defendant returned home that night. On June 3, 1982, the defendant was again requested to return to the police station. Defendant was warned of his *Miranda* rights and questioned by a different group of officers.

On June 4, 1982, Shirley Taylor's bullet-riddled body was discovered in a ditch two miles northwest of Brookville, Kansas, by a Saline County highway department employee. The body was covered by grass native to the area. The defendant was formally arrested on June 4, 1982, after the discovery of the body. During investigation after the defendant's arrest, searches were conducted of the scene, defendant's automobile, the Taylor residence, a cabin at the Scott County Lake, and the defendant's motel room in Topeka where his clothing was seized. Nothing of evidentiary value was recovered at the scene. Neither the victim's purse nor the murder weapon were ever found.

An autopsy revealed Shirley Taylor's death was caused by three gunshot wounds to the head and throat region which produced massive brain injury. A fourth shot grazed the right side of the victim's neck. From the contents of her stomach, the pathologist, Dr. William Eckert, determined Shirley Taylor died from one to two hours after ingestion of her last meal.

At the trial, a KBI firearms expert testified that a bullet recovered from the body was a .22 caliber. The defendant had previously told the police he had owned a .22 caliber pistol but had sold it six weeks prior to June 3, 1982, to an unknown Mexican male in the parking lot of a Garden City discount store. The victim's brother-in-law testified he had seen the gun at the Scott County Lake cabin on May 22, 1982. Defendant testified he was in error as to the date of the sale; the gun was actually sold about one week prior to the wife's death to the unknown Mexican male.

Evidence was introduced that the Taylors were having marital problems. Mrs. Taylor was contemplating obtaining a divorce from the defendant. Two notebooks, one prepared by each of the Taylors at a prior marriage encounter session, were admitted into evidence over the defendant's objection. The wife wrote in her notebook she attended the encounter sessions to help prepare the defendant for divorce. Mrs. Taylor wrote of feelings of love and affection for the defendant, but that the relationship of marriage was no longer possible for them. Contained in a letter to her husband was a statement of her fear of the defendant's temper. She wrote:

"One of the things I did not tell you that I am not open about you is your temper or anger. Not only do I not know how to relate to your outbursts, I must admit quite frankly that you intimidate me when you are angry, & sometimes you just scare me to distraction. I know quite rationally that your 'tantrums' are not directed at or caused by me. However, when these situations occur, I freak out. I feel panicky, sad, unable to cope, ashamed, and very insecure at these times."

The jury found Taylor guilty of murder in the first degree.

## Scope of Review

K.S.A. 60-1507 provides the process for a prisoner in custody under sentence of a court of general jurisdiction to seek release by collaterally attacking his or her conviction. An appeal may be taken from the district court to the appellate courts. A proceeding under K.S.A. 60-1507 cannot ordinarily be used as a substitute for direct appeal involving mere trial errors or as a substitute for a second appeal. Supreme Court Rule 183(c)(3) (1991 Kan. Ct. R. Annot. 133). See *Kirk v. State*, 220 Kan. 278, 552 P.2d 633 (1976); *Weathers v. State*, 208 Kan. 653, 657, 493 P.2d 270, *cert. denied* 406 U.S. 927 (1972).

The scope of review for a request for a new trial based on a claim of newly discovered evidence after the K.S.A. 22-3501 two-year limitation has expired is set forth in *State v. Bradley*, 246 Kan. 316, 318-19, 787 P.2d 706 (1990). There, a time-barred K.S.A. 22-3501(1) motion for a new trial was converted into a 60-1507 motion and, after a brief comparison to Fed. R. Crim. Proc. 33, it was determined a request for a new trial based on newly discovered evidence can be raised in a 60-1507 motion and the granting of a new trial for newly discovered evidence is in

the trial court's discretion. The same rules governing abuse of discretion for a trial court's refusal to grant a defendant's 22-3501(1) motion for a new trial for newly discovered evidence apply to appellate review of a denial of a new trial under 60-1507.

The movant has the burden of establishing grounds for relief by a preponderance of the evidence. Supreme Court Rule 183(g) (1991 Kan. Ct. R. Annot. 133). A new trial should not be granted on the ground of newly discovered evidence unless the evidence is of such materiality that it would likely produce a different result upon retrial. The credibility of the evidence offered in support of the motion is for the trial court's consideration. Where there is substantial competent evidence to support the district court's findings of fact made after a full evidentiary hearing in a 60-1507 proceeding, the district court's findings will not be disturbed on appeal. *Lloyd v. State,* 197 Kan. 389, Syl. ¶ 1, 416 P.2d 766 (1966).

Appellate review of an order denying a new trial is limited to whether the trial court abused its discretion. *Baker v. State,* 243 Kan. 1, 11, 755 P.2d 493 (1988). The test of the court's abuse of discretion is whether no reasonable person would agree with the trial court. If any reasonable person would agree, appellate courts will not disturb the trial court's decision. See *State v. Massey,* 242 Kan. 252, 264, 747 P.2d 802 (1987).

I. *Were Taylor's due process rights violated by the State's release of the victim's car?*

K.S.A. 22-2512(2) states: "When property seized is no longer required as evidence, it shall be disposed of . . . in such manner as the court in its sound discretion shall direct." Taylor claims that, because the victim's car was released without notifying him or obtaining a court order as required by K.S.A. 22-2512, his right to due process was violated because potentially exculpatory evidence was lost.

After Taylor's wife's car was processed, dusted for fingerprints, and the contents inventoried by the police, at the secured party's request, the car was turned over to the finance company holding it as security for a loan. Taylor was aware of this, and his trial counsel wrote the county attorney objecting to the release of the vehicle. Taylor did not raise this as an issue in his direct appeal.

The district court held that because Taylor failed to raise the issue in his direct appeal this issue was not proper for a K.S.A. 60-1507 action. Kansas Supreme Court Rule 183(c)(3) allows trial errors affecting constitutional rights to be raised even though the errors could have been raised on appeal, provided there were exceptional circumstances excusing the failure to raise the issue by appeal. The Court of Appeals commented that, although it believed the existence of exceptional circumstances was doubtful, it would consider the issue because a due process violation was alleged. We also will review the allegation.

In *State v. Antwine & McHenry,* 6 Kan. App. 2d 900, 636 P.2d 208 (1981), *rev. denied* 230 Kan. 819 (1982), the defendants claimed their convictions must be reversed and the charges dismissed because of the State's release of seized evidence to the victim of the defendant's crimes. The appellate court observed that the State's discretion in determining whether evidence should be released or retained for trial is not unlimited. In the absence of a showing that the returned items were clearly exculpatory or that defendants were clearly prejudiced by the failure to have access to the property, the good faith release by the prosecution of property seized in a criminal investigation to the owners thereof does not warrant a reversal of the convictions or a dismissal of the charges against the defendants. 6 Kan. App. 2d at 904-05.

The United States Supreme Court recently ruled that, in cases where the State fails to preserve potentially useful evidence, there is no due process violation unless the petitioner shows bad faith on the part of the State. *Arizona v. Youngblood,* 488 U.S. 51, 58, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988). The Court recognized that, when evidence is lost, the courts face the almost impossible task of trying to determine the materiality of unknown and undiscernible evidence. 488 U.S. at 57-58. The Court expressed an unwillingness to read the "fundamental fairness" requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. It thought that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable

bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. 488 U.S. at 58.

Unless a defendant can show bad faith on the part of the police, failure to process potentially useful evidence does not constitute a denial of due process of law. Here, the inside of the car was dusted and the information collected. Apparently the fingerprints were not developed or sent to the KBI lab for comparison, but were available to the defendant. Taylor was aware the car would be released; in fact, a member of his family later obtained possession of the vehicle. The State clearly did not make the disposition based on a court order as is required by the statute. Taylor has failed to show a bad faith due process violation or that he was prejudiced by the release of the car; therefore, the error was harmless.

II. *Did the trial court err in appointing counsel for the first 60-1507 hearing after Taylor filed two motions for self-representation?*

After Taylor filed the 60-1507 motion, he filed a motion for self-representation. Taylor acknowledged the dangers and disadvantages of representing himself and requested the appointment of advisory counsel. The district court appointed a public defender to represent Taylor. At the behest of Taylor, the public defender moved that Taylor be allowed to represent himself. The district court denied the motion, concluding that, because of the nature of the issues to be resolved, *i.e.*, constitutional and legal issues, as well as factual issues, it was required to appoint counsel to represent Taylor at the 60-1507 hearing. Taylor contends the trial court erred in requiring him to be represented by appointed counsel at the first 60-1507 hearing.

Numerous cases have held there is no Sixth Amendment right to counsel in habeas corpus proceedings. See *Ross v. Moffitt*, 417 U.S. 600, 41 L. Ed. 2d 341, 94 S. Ct. 2437 (1974). The United States Supreme Court in *Ross*, however, stated that it did not discourage the states from making "counsel available to convicted defendants at all stages of judicial review." 417 U.S. at 618.

A 60-1507 hearing is a civil proceeding and the rules of civil procedure govern. *Robinson v. State*, 13 Kan. App. 2d 244, 246, 767 P.2d 851, *rev. denied* 244 Kan. 738 (1989). Habeas corpus proceedings and motions under 60-1507 are civil in nature and are not controlled by the constitutional or statutory requirements applicable to. criminal cases. *State v. Andrews*, 228 Kan. 368, 375, 614 P.2d 447 (1980). Although there is no constitutional right to counsel in a 60-1507 proceeding, the Kansas Legislature has made counsel available if the motion presents "substantial questions of law or triable issues of fact." K.S.A. 22-4506(b).

Under existing statutes and case law, Taylor is entitled to appointment of counsel if his motion presents substantial questions of law or triable issues of fact. K.S.A. 22-4506(b). Although it is clear that Taylor could have proceeded pro. se, did the district court abuse its discretion by appointing counsel? At the first K.S.A. 60-1507 hearing, in addition to the evidence presented by his court-appointed attorney, Taylor states he would have shown (1) the romantic involvement of his wife with two other men; (2) a neighbor had seen someone in the Taylor home after the victim was allegedly dead and Taylor was in Topeka; (3) the police had failed to disclose knowledge of the neighbor's statement; (4) he had been under police surveillance after his wife was reported missing; (5) prior to his arrest, the police had locked him in a holding cell on June 2 and 3, 1982; (6) the police questioned him before there was probable cause; and (7) he was improperly questioned by the police after requesting counsel.

The district court found Taylor was well represented at both 60-1507 hearings. It is important to note that Taylor had counsel of his own choice during the second 60-1507 hearing. Each of the issues which Taylor claimed he was precluded from raising in the first hearing could have been raised at the second hearing. Taylor's failure to present the evidence and raise the issues at the second hearing causes the claims to now be without validity on appeal. Taylor was not prejudiced by the trial court's refusal to allow him to proceed pro se; such refusal was harmless error and is no basis for the reversal of the judgment of conviction. See *Hagedorn v. Stormont-Vail Regional Med. Center*, 238 Kan. 691, 701, 715 P.2d 2 (1986).

III. *Was Taylor denied effective assistance of counsel at trial and on direct appeal?*

The United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), set forth a two-pronged test for determining whether criminal defendants have been denied effective assistance of counsel. Kansas adopted the *Strickland* test in *Chamberlain v. State*, 236 Kan. 650, 657, 694 P.2d 468 (1985). The defendant must show counsel's representation fell below an objective standard of reasonableness and there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial would have been different. 236 Kan. at 656-57.

In meeting this burden, the defendant must overcome a presumption that counsel's assistance was reasonable. 236 Kan. at 654. Further, "[m]uch deference and reliance must be placed upon the wisdom and determination of the trial judge who saw all of the proceedings first hand as they happened." 236 Kan. at 659-60. The standard to be applied when a petitioner is alleging ineffective assistance of appellate counsel is the same as for trial counsel. *Baker v. State*, 243 Kan. at 6-7 (following *Smith v. Murray*, 477 U.S. 527, 535-36, 91 L. Ed. 2d 434, 106 S. Ct. 2661 [1986]).

The district court and the Court of Appeals addressed all of Taylor's claims and found Taylor had been afforded adequate representation. We will briefly discuss each of Taylor's seven claims of ineffective counsel as well as the overall effect of the alleged errors by counsel.

1. Failure to file a pretrial motion for dismissal based on the release of the victim's car by the State.

Discovery was available of the vehicle's contents which had not been shown to have any material effect on the outcome of the trial. We have previously determined that Taylor failed to show bad faith on the part of the police in releasing the car. Dismissal is rarely appropriate without a showing of prejudice to the petitioner. *State v. Antwine & McHenry*, 6 Kan. App. 2d at 905. Prejudice did not exist in this case. The trial court properly found the failure to file a motion to dismiss was not ineffective assistance of counsel.

2. Failure to present evidence of petitioner's earnings and employment during the marriage.

Taylor claims the State implied to the jury that his wife was the breadwinner in the family and, because she was contemplating divorce, he would be deprived of his source of support. Taylor asserts he would have called an accountant who would have testified as to his income through the years; however, his counsel feared such testimony would open several areas for cross-examination which would have been more damaging to his defense than full disclosure of income would have been helpful. The record reveals this was not the focus of the State's prosecution. During its closing arguments, the State never argued the victim's greater income was Taylor's motive for murder; rather, the State focused on the husband's jealousy and the wife's apparent involvement with other men.

Under the circumstances, the decision not to call the accountant appears to be reasonable and logical trial strategy for defense counsel. Taylor has not demonstrated that he was prejudiced by trial counsel not calling the witness to refute the State's contention. The trial court's finding that this was not ineffective assistance of counsel is justified.

3. Failure of trial counsel to adequately cross-examine Dr. Eckert and/or to employ a pathologist for the defense.

During trial, the exchange between Dr. Eckert and petitioner's counsel focused on the time between the day of the victim's death and the autopsy. The autopsy report and the pathologist's testimony did not indicate that the victim might have been killed later than alleged by the State. At the 60-1507 hearing Dr. Eckert maintained he never testified as to the date of death during the trial but had testified the victim had died two to four hours after eating. Dr. Eckert maintained if he had been asked he would have given the same response at trial in 1982 as to the date of death as he did at the hearing in 1990. The district judge noted Dr. Eckert's testimony at the preliminary hearing conflicted with his subsequent testimony at the 60-1507 hearing and specifically found Dr. Eckert not to be a credible witness.

Prior to trial, Taylor's trial counsel consulted with the pathology department at the University of Kansas and had a pathologist review Dr. Eckert's findings. The head of the pathology depart-

ment did not believe Dr. Eckert was incorrect as to any of his statements in the report. It would not have been apparent in 1982 that additional pathology evidence could have been developed. Under such circumstances, trial counsel's performance was not so deficient as to have denied Taylor a fair trial.

4. Trial counsel's failure to refute the State's ballistics evidence.

Taylor contends the defense ballistics witness, Lee Roy Pilcher, had limited qualifications as an expert and was ineffectively handled. It appears that trial counsel got all available testimony admitted at the trial that Pilcher's qualifications allowed.

Although Taylor's expert, Dr. Wayne Dunning, did not testify as a defense witness at trial, the testimony of the two ballistics experts during the 60-1507 hearing was contradictory. At the 60-1507 hearing, the district judge found the State's expert, Carl Carlson, to be extremely credible. Carlson testified for the State during the trial that the bullets that killed the victim were .22 caliber. At trial and at the 60-1507 hearing he testified that because the bullets had fragmented, the model of the pistol that fired the bullets could not be determined. The district judge found Dr. Dunning to be less credible. Dr. Dunning stated the bullets were not fired from a gun of the same model as owned by the defendant. On appeal, we will not reweigh the credibility of witnesses.

It is possible that a more qualified ballistics expert could have testified at the trial; however, during the 1989 and 1990 hearings the attempt to elicit a "more qualified" expert's testimony was not considered credible by the district judge. The trial court saw the witnesses, heard the testimony, and did not abuse its discretion in finding this was not ineffective assistance of counsel. Therefore, Taylor has not met his burden to demonstrate ineffective assistance of counsel on this issue.

5. Trial counsel's failure to develop other suspects or impeach the testimony of potential suspects with information available but not used.

Taylor claims his wife's lover and a friend of the lover killed her after a fight over her during a camping trip. The district court noted there was no substantial testimony introduced during the two 60-1507 hearings to prove this unsubstantiated claim. The

district court found that Taylor had not met his burden on this issue. We agree.

6. Trial counsel's failure to raise Fourth Amendment seizure grounds in the petitioner's pretrial motions to suppress.

This contention is without merit. In the original appeal, Taylor's trial counsel claimed that Taylor's Fifth and Sixth Amendment rights were denied and attempted to show that Taylor was held in custody when locked in a holding cell and at some point requested to be allowed to talk to an attorney. The issues were properly raised and considered both at the trial court level and on appeal. Taylor's claim that his trial counsel was ineffective as to the suppression of the evidence is without merit.

7. Trial counsel's failure to properly prepare Taylor to testify at trial.

Trial counsel testified at the 60-1507 hearing that he did prepare Taylor to testify and discussed with Taylor whether he should testify and the effect of his testifying during the murder trial. Taylor's complaint is that the prosecutor discredited much of Taylor's testimony during cross-examination and presented rebuttal evidence that caused Taylor to change his claim as to the date he sold the .22 caliber pistol to an unknown Mexican male.

There is no evidence that Taylor's trial counsel could have known the date Taylor first stated the pistol was sold would be rebutted by the State. Taylor has not met his burden of showing ineffective assistance of counsel on this issue, and the trial court's finding that he was properly prepared cannot be reversed.

Finally, Taylor's counsel argues a new trial should be ordered because "the cumulative effect of several trial errors or irregularities is such an appellate court cannot declare from the record as a whole that the substantial rights of an accused have not been prejudiced." *State v. Stafford*, 213 Kan. 152, Syl. ¶ 6, 515 P.2d 769 (1973). This wording was specifically withdrawn and deleted from the *Stafford* opinion by the Supreme Court at 213 Kan. 585, 518 P.2d 136 (1974). The cumulative effect rule is that trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is

overwhelming against the defendant. *State v. Williams,* 235 Kan. 485, Syl. ¶ 10, 681 P.2d 660 (1984).

We have considered the cumulative effect as well as the individual effect of all of the actions taken by Taylor's counsel both at trial and on appeal. All of these matters were also considered by the district judge at the 60-1507 hearing. The district judge found that Taylor was not denied effective assistance of counsel at trial. Our scope of review on appeal is whether that finding by the district judge was an abuse of discretion. After reviewing the record, we find all of Taylor's contentions, individual and cumulative, that he was denied effective assistance of counsel, are without merit.

IV. *Did the trial court err in determining a new trial was not warranted on the basis of the entomology evidence alleged to be newly discovered?*

Taylor contends that an examination by Dr. Robert Hall, an entomologist, and his testimony at the 60-1507 hearing indicates that maggot samples taken from the victim's body during the autopsy place the time of death no earlier than May 30, 1982, at which time he had an alibi. This evidence is claimed to be newly discovered.

Hall is a professor of entomology retained by the defense. At the 60-1507 hearing, he testified he received the evidentiary maggot samples from the Salina police department in the spring of 1990. The two maggots could not be examined and identified when received by Hall. He had to rehydrate the two maggots, *i.e.,* first determine they were not fragmented, and then add distilled water and wait several days until the maggots came back into their original state.

One of the maggots was a third instar *Lucilia illustris,* a greenbottle fly that is particularly common around carrion. *Lucilia illustris* are known to arrive habitually at corpses within minutes of death. After a female deposits its eggs, the eggs hatch as larvae or maggots. The maggots go through four identifiable stages on their way to adulthood. The first instar is the youngest. The specimen Hall examined was a third instar but could not be identified as early or late third instar. There is a fourth instar that occurs inside the constricted exuvium of skin of the third instar which is called the puparium, but it is not readily apparent.

There are two ways to determine whether a maggot is an early or a late third instar. One is by noting behavior, and to do that, it is necessary to have living specimens. The second way would be to note the relative length of the crop or the area in the gastrointestinal tract of the maggot. To do that, it is necessary to have either living or properly preserved specimens. The specimen Hall examined was not a properly preserved specimen. The specimen could not be sectioned to observe its digestive tract.

The rate of development or the growth rate of a maggot is highly dependent upon temperature. Development proceeds more rapidly the higher the temperature. Knowledge of ambient temperature is necessary in determining the developmental rate of insect larvae. Other factors affecting development are adequate food supply and the mass of larvae present. When there is a sufficient biological data base, if the species and stage of development are known, it is possible to retrospectively calculate how long it would have taken that particular maggot to arrive at its stage of development.

Because the single maggot was not living when Hall obtained it, he had to use rearing studies to determine the particular rate of development of *Lucilia illustris* at different temperatures. If a rearing experiment has been conducted at a variety of constant temperatures, the study can be used to make inferences regarding the length of developmental time. Hall relied on two papers authored by Dr. Hanski, an entomologist from the University of Helsinki in Finland. One of the papers was published as early as 1976.

Hall calculated average daily temperatures and an average temperature for the entire period of time based on the National Weather Service report for the City of Salina (the average daily temperature where the body was discovered was unknown), and then made two calculations based on the experimental data presented in the rearing study. One calculation was based on constant temperature rearing and the other on changing temperatures. He made a series of calculations from the developmental graphs that were presented in the paper on the basis of gross weight of the maggot. His calculations were based on the supposition that the maggot was an older third instar. He then found temperature curves that bracketed the average temperature during the period

of time between May 28 and June 5 and concluded that under constant temperature, the average development probably would have been a maximum of six days from the immature to the third instar. He testified he tried to err on the conservative side. He concluded that the estimate of six days would be the maximum period of time but it probably would not be the most likely estimate because of the effect of changing temperatures.

To estimate the day of death, the inference as to the number of days of larval development would be used by counting backwards from the date of extraction of the maggots at the autopsy, if maggot growth stopped when extracted at the autopsy. If the inference was six days, and if maggot growth stopped at the time of the autopsy and the autopsy was on June 5, estimated date of death would be May 30.

Hall has been involved in interpreting data from maggots about 17 years, but his area of emphasis is not in post mortem interval as it relates to dead human bodies. He has dealt mostly with agricultural-related matters, *e.g.,* flies that affect livestock production. Hall indicated the use of insects as forensic indicators to determine the time of death has been used since the mid-1200's in China, but it is only within the past decade or so that there has been a sufficient data base for the broad spectrum of species.

The State's attorney noted the record on appeal does not indicate that the maggot was living at the time it was removed from the body by Dr. Eckert. If the maggot was not living when taken from the body, Shirley Taylor's death would be moved back by the amount of time expired since the death of the maggot. In addition, William C. Rodriquez, III, a forensic anthropologist with the Office of the Onondaga County Medical Examiner, Syracuse, New York, testified as an expert witness for the State. Rodriquez agreed that Hall was qualified and correctly determined the maggot specimen to be a late stage third stage *Lucilia illustris* larva. He also agreed that Hall's use of the Finnish rearing study was proper to determine the development of the specimen. Rodriquez disagreed with Hall's determination as to the number of days from death to the discovery of the body. Rodriquez determined a lengthier period of time had elapsed because Hall had used the Salina climate rather than the microclimate scene

where the flies were actually feeding and laying their eggs on the body. Consequently, a slight change in the precise time of the maggot's death or in the temperature used to calculate the maggot's growth could place Shirley's death during the evening of May 28 or render questionable the reliability of the maggot evidence in estimating the time of death.

K.S.A. 22-3501 allows a trial court to grant a new trial based on newly discovered evidence "in the interest of justice." Kansas courts have developed a two-pronged test for determining when new trials are required under K.S.A. 22-3501:

1. The evidence must be new; the defendant must show the evidence could not with reasonable diligence have been produced at trial. *State v. Neal*, 243 Kan. 756, 760-61, 763 P.2d 621 (1988).

2. The evidence must be of such materiality it would likely produce a different result at a new trial. *State v. Neal*, 243 Kan. at 760.

It is important to note the trial court did not rule as to the reliability of Hall's conclusion as to the date of death. The district court specifically found the identification of maggot growth on a body as an investigative tool in ascertaining the interval between death is not a recent or novel development. It held information necessary to perform the test was known in 1982 when appellant was tried for the murder of his wife. Hall's own testimony provides substantial competent evidence to support the trial court's finding the maggot test could have been performed in 1982.

Was the maggot test discoverable with reasonable diligence? The burden is on defendant to prove that it was not. *State v. Neal*, 243 Kan. at 761. The district judge observed Taylor presented no direct evidence on this point and found Taylor had failed to pass the two-part test necessary to obtain a new trial based on newly discovered evidence. After reviewing the record, we agree the district court did not abuse its discretion in denying a new trial based on newly discovered evidence.

V. *Did the trial court err in failing to grant a new trial on the basis of newly discovered pathology evidence?*

At the 60-1507 hearing Dr. William Eckert, a forensic pathologist, was a witness called by the defendant. Dr. Eckert stated he was not informed of the facts surrounding the death of the

victim and the discovery of the body prior to performing the autopsy. Dr. Eckert testified that after reviewing the facts and his prior reports it was his opinion that the victim had been dead only two to four days at the time he performed the autopsy on June 5, 1982. Taylor contends this newly discovered pathology evidence establishes that the date of death occurred an additional two to four days prior to the discovery of the victim's body, a time for which Taylor has an alibi.

At the trial in 1982, Dr. Eckert was a witness for the State. Dr. Eckert testified that the victim died within one to two hours of her last meal. The parties agree that Dr. Eckert was never asked during the 1982 trial his opinion as to the date of death, as his duty as a pathologist was to determine the cause of death.

Dr. Eckert's 1990 testimony conflicted with his testimony at Taylor's preliminary hearing and the autopsy report he had previously prepared.

The court noted Dr. Eckert's prior testimony at the preliminary hearing, where he was questioned by the State:

"Q. So based, to summarize then, you think that in all probability the . . . margin or error could be from an hour to two hours?
"A. Yes I would say that is a liberal period.
"Q. Of course you didn't get the opportunity to do this autopsy for a period of approximately a week afterwards the posted date of death.
"A. Yes sir.
"Q. Now, as far as the time of death, is that actually, is there some room for speculation on that just from your investigation?
"A. Well, I tell you. As far as my usual reply to that would be as a pathologist, my responsibility is cause of death and injury. The time of death is the responsibility of the coroner. Now, I saw the body. I don't know whether they had, I can't remember whether they had put it into the cooler. We have a refrigerator, refrigerated room there so I can't really be that knowledgeable. Also I'm not, I wasn't or I'm not familiar with the weather conditions and temperature that was at the time.
"Q. Let's presume since you can deal somewhat with hypotheticals this was a period of time which we had much rain in this area and that the body would have been exposed to that kind of weather.
"A. Yes.
"Q. Taking that into effect in your opinion, would that affect the decomposition of the body, the wet weather?
"A. Another fact you would have to have is the temperature.
"Q. Let's presume the temperature to be in the 80, 90 range.

"A. And also the shelter that the body was in. I did not see any pictures of the scene.

"Q. Let's further presume it was in the open covered by native grass in the area.

"A. I would say that this, and certainly the body looked like it had been dead for that period of time and that is consistent with the period of time that you mentioned."

At the time of the 1990 60-1507 hearing Dr. Eckert stated there was no marked heart decomposition. Dr. Eckert's 1982 autopsy report specifically stated the victim's heart revealed "marked decomposition and gas formation."

Dr. David Clark, the coroner, had determined the date of death to be May 28, 1982. Dr. Clark testified at the 1990 60-1507 hearing that he told Dr. Eckert during a telephone conversation of the information given him by the police and his observations of the victim's body at the crime scene. Dr. Clark testified Eckert agreed with his (Clark's) determination that death had occurred on May 28, 1982. Dr. Clark further testified he believed Dr. Eckert's professional acumen had decreased, and since 1986-87 he had discontinued using Dr. Eckert's services.

The district court determined Dr. Eckert was not a credible witness. The credibility of evidence is for the trial court's consideration. *State v. Shepherd,* 232 Kan. 614, 624, 657 P.2d 1112 (1983). Dr. Eckert did testify as to the post-mortem interval during the preliminary hearing, and even if he had not, he was available to be asked his opinion during the trial. The court determined the evidence was not newly discovered.

The evidence presented at the 60-1507 hearing was not newly discovered and it could have been produced or pursued at the 1982 trial. Dr. Eckert's testimony was controverted by several witnesses, his prior testimony, and the autopsy report. It is not for us on appeal to interject our opinion of the evidence as being of any determinative nature. The trial court did not abuse its discretion in holding that the petitioner's burden of proof was not met and refusing to grant Taylor a new trial.

VI. *Were Taylor's due process rights violated because the State withheld exculpatory evidence?*

When Taylor's counsel inspected the evidence being held by the Salina Police Department in 1989, a tape recording of part

of the autopsy made by Officer Barry Plunkett of the Salina Police Department was discovered. The recording was Plunkett's method of taking notes to make his written report. Taylor's counsel had the tape recording enhanced by the F.B.I. Taylor claims that critical evidence on the tape, which showed Dr. Eckert had determined that chicken in the victim's stomach was not fried and the stomach contained tomato, was withheld by the State. Taylor claims it is critical that Dr. Eckert is heard to say on the tape that the chicken eaten by the victim was not fried and there was a tomato in the victim's stomach contents. This newly discovered evidence is deemed critical because the Brookville Hotel, where the victim supposedly ate her last meal, served "fried" chicken and did not serve tomatoes.

As to the chicken, the transcript of the tape provided by Taylor's attorney shows:

"[Unidentified female voice says:] Is that chicken?
"[Dr. Eckert:] Yes, yes, that's . . . .
"[Then, the female voice again:] Is it fried chicken?
"[Dr. Eckert:] Well, no, it's still soft."

This is the only comment as to the chicken in the stomach during the autopsy. The autopsy tape does not "identify" the stomach contents as "fried" chicken and the contents are identified only as chicken on several reports of officers present at the autopsy. The typed post-mortem examination signed by Dr. Eckert neither mentions the stomach contents nor requests that the contents be examined by the lab specialist. Therefore, the testimony of Dr. Eckert as to whether the chicken was or was not fried had no scientific basis. During the 60-1507 hearing, when asked by Taylor's attorney to describe the manner of cooking of the chicken observed in the victim's stomach, Eckert stated:

"Q. Dr. Eckert, part of the transcription of the autopsy tape, Exhibit F, reflects that this person asked you if it was fried chicken, to which you replied, 'No, it's too soft.' Can you tell me what scientific basis you utilized with respect to your reply that the chicken was too soft to have been fried chicken?
"A. Probably personal experience.
"Q. How much personal experience do you have in examination of stomach contents, sir?
"A. Well, in every case that I do.
"Q. And how long have you been a forensic pathologist?

"A. I was talking about eating myself.
"Q. Eating yourself?
"A. Yeah, I mean chicken. It seems like it is drier; that is, the fried chicken.
"Q. "It's much drier?
"A. Yeah."

A few questions later, Eckert was asked to describe the way in which the chicken in the victim's stomach had been cooked. Eckert replied:

"Well, I'm not a cook, to tell you the truth, but it would seem to me that they hadn't been exposed to any heat for any major proportion, in other words, from deep fried meat or deep fried sauce. I don't see anything that looks charred from what—and maybe it's because of the way that I fry chicken. I usually burn it, but the chicken meat didn't look in any way like I would usually . . . . I can identify it as white chicken meat and I don't see any defects or artifacts in it due to burning or exposure to high heat."

During cross-examination, Dr. Eckert was asked:

"Q. Now, you stated in your direct testimony, you discussed the manner in which—
"A. Okay.
"Q.—the manner in which that chicken had been prepared, is that correct?
"A. I'm not going to be an expert on that. I'm not an expert but just . . . .
"Q. You're unable to say then whether that is fried chicken versus broiled chicken?
"A. Well, fried chicken, to me, usually has something wrapped around it, some kind of floury stuff or I don't know what they call that, but there is nothing here that looks in any way fried.
"Q. Is not possible that the fried portion could have been peeled off and the meat itself eaten alone?
"A. Sure.
"Q. And then there would be no indication of any fried or flour within the stomach contents?
"A. Well anything is possible. I'm just giving you an opinion as a chicken eater."

The trial court found the tape made during the autopsy was not considered as evidence by the State. The tape was made by the officer in lieu of handwritten notes for the preparation of his written report.

Dr. Eckert admitted he was not an expert on the manner in which chicken was prepared, and his characterization of the manner of preparation does not have sufficient foundation or expertise to be legally significant. Given the actual comment on the autopsy tape and Eckert's testimony at the 60-1507 hearing regarding the

"not-fried" chicken, it cannot be said that no reasonable person would have made the determination that the evidence was not of sufficient materiality as to affect the ultimate outcome of the trial. Thus, the trial court did not abuse its discretion in not granting a new trial on grounds the newly discovered tomato and "not-fried" chicken evidence warranted a new trial.

Taylor also claims his due process rights were violated by the State's "withholding" of the information contained in Officer Plunkett's tape recording that tomato was found in the victim's stomach.

Shortly after Dr. Eckert is heard to identify the victim's stomach contents as including tomatoes, Officer Plunkett is heard to say, "[S]cratch the tomato, it's a carrot." At the 60-1507 hearing, Officer Plunkett testified:

"Q. All right. Do you recall him telling you that there was *[sic]* tomatoes in the stomach?
"A. At one point he said he saw tomato and then I believe the comment was shortly after that, 'Scratch that, it's a carrot.'
"Q. Is that your voice?
"A. Yes, it is.
"Q. Why did you do that?
"A. Because Dr.—that was Dr. Eckert's observations and I wanted it on my notes."

Dr. Clark testified that, after the autopsy when he and Dr. Eckert discussed the contents of the victim's stomach, Dr. Eckert did not mention tomatoes or lettuce but stated the stomach contents were chicken, potatoes, and corn.

In *State v. Kelly*, 216 Kan. 31, 33-36, 531 P.2d 60 (1975), the court traced the development of the rules involving the State's duty to disclose exculpatory evidence. As first stated in *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), even a passive or negligent failure by the State to disclose exculpatory evidence may result in a new trial. The rule is, as stated in *Kelly*:

"When the withholding of evidence by the prosecution is not deliberate and in bad faith and when the prosecution has not refused to honor a request for the evidence made at a proper stage of the proceedings, the defendant should be granted a new trial only if the record establishes: (1) that the evidence was withheld or suppressed by the prosecution, (2) that the evidence withheld was clearly exculpatory, and (3) that the exculpatory

evidence withheld was so material that the withholding of the same from the jury was clearly prejudicial to the defendant." 216 Kan. at 36.

Taylor claims *State v. Gammill,* 2 Kan. App. 2d 627, 585 P.2d 1074 (1978), is analogous to the facts herein. In *Gammill,* negative results of a sperm test were not disclosed to the defendant until two days after his rape trial. Because a deputy took the victim to the hospital, knowledge of the information was imputed to the prosecution, and it was deemed improper for it not to be communicated to the defendant.

As said in *State v. Wolf,* 7 Kan. App. 2d 398, 406, 643 P.2d 1101, *rev. denied* 231 Kan. 802 (1982), "[T]he evidence must be sufficiently material on the ultimate question of guilt or innocence to have played a determinative role in the outcome of the trial." *State v. Smith,* 245 Kan. 381, 385, 781 P.2d 666 (1989), requires a "reasonable probability" that the outcome of the trial would have been different if the evidence had been disclosed.

The trial court specifically found that the autopsy tape was not deliberately withheld. The trial court's finding that the tape was not deliberately withheld is supported by substantial competent evidence. The prosecution reasonably honored all discovery requests at the time of the 1982 trial. The confusion on the tape about the presence of tomatoes in the victim's stomach appears to be explained by the subsequent statement saying the substance was actually carrots.

The trial court also found Taylor failed to demonstrate the allegedly withheld evidence had sufficient materiality to warrant a new trial. We agree. Dr. Eckert's observations about the method of cooking of the chicken were not followed by subsequent analysis and lacked any basis of scientific fact. We hold the evidence was not newly discovered nor sufficiently material to have played a determinative role in the outcome of the trial. Neither was the evidence "withheld" by the State.

We have considered all of the arguments raised in both of the briefs filed on Taylor's behalf, the first by the appellate defender, the second by his retained counsel. We have also considered the trial court's opinion. The trial court did not abuse its discretion in any of its findings of fact or conclusions of law sufficient to require reversal or the granting of a new trial.

Affirmed.

ABBOTT, J., dissenting: My disagreement with the majority centers around Dr. Eckert's testimony concerning the victim's stomach contents and his opinion of how long the victim had been dead before the autopsy.

The crucial issue in this K.S.A. 60-1507 hearing is whether the victim ate her last meal at the Brookville Hotel on Friday evening, May 28, 1982. The evidence is uncontroverted that the victim died between one and two hours after eating her last meal. The time of death was crucial to the State because the defendant had an alibi if death did not occur within a few hours after the defendant took the victim to the Brookville Hotel for dinner.

When the defendant was charged, the affidavit for a warrant states that Dr. Eckert performed an autopsy. The affidavit reported Dr. Eckert's findings as follows: "The stomach contents showed *fried chicken*, potatoes and corn. From the stage of the digestive process, time of death was placed at less than one hour after the last meal. The stomach contents [are] consistent with the standard meal served at the Brookville Hotel." (Emphasis supplied.)

In affirming Taylor's conviction, this court assumed the Brookville Hotel was where the victim ate her last meal: "From the contents of her stomach, the pathologist determined Shirley Taylor died from one to two hours after ingestion of her meal at the Brookville Hotel." *State v. Taylor*, 234 Kan. 401, 403, 673 P.2d 1140 (1983). Later, while reviewing the sufficiency of the evidence, this court stated, "The food in Shirley Taylor's stomach was eaten one to two hours before she died, and was the same food eaten at the Brookville Hotel." 234 Kan. at 409. The evidence was that the victim died within one to two hours after eating her last meal; however, the evidence was not conclusive that the victim ate her last meal at the Brookville Hotel.

After his conviction was affirmed, the defendant eventually obtained his present counsel, who discovered the autopsy audiotape that clearly qualifies as newly discovered evidence. That tape was made by Officer Barry Plunkett of the Salina Police Department. At the autopsy, in addition to Dr. Eckert and an unidentified female, Plunkett, Joe Ingstrom of the Saline County

Sheriff's Department, and John Green and Jim Lane of the Kansas Bureau of Investigation were present.

Two points are important relating to information on tape. The Brookville Hotel serves only *fried* chicken and it does not serve *tomatoes*. Dr. Eckert's testimony is that the chicken was not fried. The majority weighs Dr. Eckert's K.S.A. 60-1507 testimony to affirm the trial court. That is the function of a jury.

During the autopsy, when Dr. Eckert opened the stomach, the transcript of the tape, which Dr. Eckert testified was correct, quotes as follows:

"[Dr. Eckert:] [S]he had *chicken*. why don't you call up and see what else they had on the menu, plus *tomato* . . . . (Emphasis supplied.)
"[Unidentified voice:] Well, that's going to be important.
"[Dr. Eckert:] What we can do is we can put this in a tray like this, if you want to take a picture of it, so you can have that evidence, too; or, we can just put it all in a jar.
"[Unidentified male voice:] The statement the guy made is that apparently they went to Brookville, had lunch or dinner and he took her back to Salina, yeah, she was found north of Brookville. Right.
"[Unidentified female voice says:] Is that chicken?
"[Dr. Eckert:] Yes, yes, that's . . . .
"[Then the female voice again:] Is it fried chicken?
"[Dr. Eckert:] Well, no, it's still soft."

It is obvious that at that point Dr. Eckert did not know what the Brookville Hotel serves because he suggested they check the menu. It is equally obvious that others present at the autopsy knew that the Brookville Hotel serves pan-fried chicken family style and has had the same basic menu for decades.

Dr. Eckert testified he gave the stomach contents, which were in a jar, to the KBI. He also stated he suggested they have an expert in St. Louis, whose name and address he furnished, examine the contents.

The tomato versus carrot issue is different. Dr. Eckert said on the tape it was tomato. The tape reveals that, while Dr. Eckert was examining the wounds to the head, the tape clicked off and on. Then Plunkett said, "Reference to the stomach contents, scratch the tomato, it's a carrot." The tape continued with the examination of the victim's head. Dr. Eckert never wavered in his testimony that the object was tomato, not carrot.

"Q. With respect to that section where Officer Barry Plunkett interrupts on the tape recording and interjects that in examining the stomach contents, you changed your observation that there were tomatoes in the stomach to, 'It's a carrot", did you make that change at the time of the autopsy?

"A. I don't remember carrot. I remember tomato.

"THE COURT: Would you repeat your answer?

"THE WITNESS: I didn't remember the carrot but I remembered the tomato.

"THE COURT: I'm not sure that is responsive to the question, is it?

"Q. Was there tomato in the stomach in 1982 when you observed the contents at the autopsy?

"A. Yes.

"Q. Did you testify in 1982 at the trial of this matter that not only was there tomato in the stomach but there was also lettuce?

"A. I said lettuce or cabbage, something like that.

"Q. And with respect to that, the lettuce and tomato that you testified to, are they observable in pictures today that are available from this autopsy?

"A. The pictures that—I looked for specifically, a reddish object which I felt was a tomato, and I see it on the picture of the gastric contents.

"Q. In your testimony in 1982, you say that the tomato is obvious. Is it still obvious to you today in observing that picture?

"A. Certainly.

"Q. It is?

"A. Uh-huh."

On cross-examination, Dr. Eckert again said it looked like tomato and he was "sure [he] would know the difference between carrots and tomatoes." He later testified:

"A. . . . Of course, I'm sure that I could tell the difference between the two in looking at it visually on a tray.

"Q. Okay. Well, visually looking at the substances on a tray, do you see an item which appears to look like a carrot?

"A. No, I see something that looks like a—like a tomato.

"Q. Do you see any orange substances which could be a carrot?

"A. No, the carrot has substance."

There was also testimony that the victim had consumed popcorn within one and one-half hours prior to going to Brookville with the defendant. No trace of popcorn was noted in the stomach contents.

The victim's body was found seven days after the Brookville dinner. Dr. Eckert, as noted by the majority, testified the victim had been dead two to four days when he performed the autopsy.

Gary Schoshke discovered the body while mowing the ditch. He was within an arm's length of the body and, basically, remained at the location for several hours. Schoshke testified he did not smell anything, which would seem to be more consistent with Dr. Eckert's opinion than the State's position that seven days had passed.

I also have some reservations about writing off Dr. Eckert's testimony as not credible. This is the same Dr. Eckert who acted as Sedgwick County Coroner starting in 1967 and was still serving at the time of testimony in this case. He performed approximately 300 autopsies a year in that capacity. Many of the persons serving long sentences for murder and manslaughter are in prison based on Dr. Eckert's testimony. For example, in *State v. Bird,* 240 Kan. 288, 289, 729 P.2d 1136 (1986), *cert. denied* 481 U.S. 1055 (1987), the first autopsy, by a different doctor, resulted in an autopsy report that the deceased had died as a result of an automobile accident. The body was exhumed some nine months later, and, after performing an autopsy, Dr. Eckert testified the deceased had been murdered. The defendant was convicted.

Three months before the trial court heard this case, this court, in *State v. Colwell,* 246 Kan. 382, 386, 790 P.2d 430 (1990), said of Dr. Eckert: "The defense presented Dr. Eckert, who is known to this court to have a national reputation in the field of forensic pathology." This court then reversed a first-degree felony-murder conviction based on the trial court's refusal to allow the defendant to present Dr. Eckert's qualifications to the jury because the State had stipulated he was qualified as an expert. The rationale was that Dr. Eckert was so eminently qualified that it was prejudicial to the defendant to tell the jury Dr. Eckert was qualified as an expert without allowing the defendant to place the doctor's qualifications before the jury.

As recently as January of this year, we found jurisdiction proper based on Dr. Eckert's testimony that a victim shot in the neck with a shotgun would have lived two or three minutes. Venue was challenged because the victim was shot on one side of a road dividing two counties and then dragged across the road to the other county. *In re J. W. S.,* 250 Kan. 65, 69, 825 P.2d 125 (1992).

The evidence in this case is weak at best. The bullet wounds were consistent with the victim being shot while a passenger on

the right side of a car. No evidence was produced that the murder took place in the defendant's car or at the site where the body was found. No physical evidence was found linking the defendant to the crime.

If a jury concluded the chicken was not fried or the victim had tomato in her stomach, the jury could conclude the victim was not killed shortly after being with the defendant at the Brookville Hotel. If the victim was not killed after having dinner with the defendant at the Brookville Hotel, the State has little evidence against the defendant.

I do agree with the majority on the other issues, although the possibility exists that some of the evidence the trial court rejected might be both admissible and persuasive to a jury on retrial.

I would reverse and remand for a new trial, based on the evidence the State did not disclose to the defendant. The State recognized the significance of the contents of the victim's stomach, yet did not have the contents examined and did not reveal Dr. Eckert's opinions to defense counsel.

ALLEGRUCCI, J., joins in the foregoing dissent.